# 24-345-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATE DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX
FOR DEFENDANT-APPELLANT**

Thomas J. Butler, Esq.
Attorney for the Defendant-Appellant
350 Northern Blvd., Suite 324-1032
Albany, New York 12204
(877) 847-1896

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE.........................................................................2

    I.    FACTS ....................................................................................2

    II.   PROCEDURAL HISTORY ................................................21

SUMMARY OF THE ARGUMENT ..........................................................23

ARGUMENT. ............................................................................................24

  POINT I

  THE DISTRICT COURT ERRED IN DENYING TEMAN'S
  RULE 33 MOTIONS ...............................................................................24

      A.    The Court Should Reverse the District Court's Ruling on
            Teman's Rule 33 Motion Regarding New Evidence as to
            18 Mercer and in Not Holding a Hearing...........................24

            I.    FACTS.....................................................................24

            II.   STANDARD OF REVIEW..........................................31

            III. LEGAL ARGUMENT .................................................32

      B.    The Court Should Reverse the District Court's Ruling on
            Teman's Rule 33 Motion Regarding New Evidence As to
            Soleimani and in Not Holding a Hearing...........................42

            I.    FACTS.....................................................................42

            II.   STANDARD OF REVIEW..........................................47

III.  LEGAL ARGUMENT ...................................................48

CERTIFICATE OF COMPLIANCE........................................54

SPECIAL APPENDIX...........................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Brady v. Maryland,
373 U.S. 83 (1963) ...................................................................*passim*

Cooper v. Graham,
Case No. 10-cv-6467,
2011 U.S. Dist. LEXIS 132625
(W.D.N.Y. Nov. 17, 2011) ...............................................................33

Giglio v. United States,
405 U.S. 150 (1972) ...................................................................*passim*

Government of Virgin Islands v. Fahie,
419 F.3d 249 (3d Cir. 2005) ............................................................34

Hughes v. Phillips,
457 F. Supp. 2d 343 (S.D.N.Y. 2006) ..............................................35

Kyles v. Whitley,
514 U.S. 419 (1995) ..........................................................34, 40, 52

Sanders v. Sullivan,
863 F.2d 218 (2d Cir. 1988) .......................................................39, 53

Schledwitz v. United States,
169 F.3d 1003 (6th Cir. 1999) ....................................................40, 52

Valentin v. City of Rochester,
2018 U.S. Dist. LEXIS 182601
(W.D.N.Y. Oct. 24, 2018) ................................................................33

United States v. Andrews,
532 F.3d 900 (D.C. Cir. 2008) ...................................................34, 52

United States v. Brock,
789 F.3d 60 (2d Cir. 2015) ..............................................................38

United States v. Brooks,
    966 F.2d 1500 (D.C. Cir. 1992) ...................................................34

United States v. Cuffie,
    80 F.3d 514 (D.C. Cir. 1996) ...............................................35, 52

United States v. Disston,
    582 F.2d 1108 (7th Cir. 1978)..............................................42, 54

United States v. DiTomasso,
    932 F.3d 58 (2d Cir. 2019) ...................................................31, 47

Untied States v. Ferguson,
    246 F.3d 129 (2d Cir. 2001)..................................................32, 48

United States v. Forbes,
    790 F.3d 403 (2d Cir. 2015) ........................................................32

United States v. Gramins,
    939 F.3d 429 (2d Cir. 2019)..................................................32, 48

United States v. James,
    172 F.3d 79 (2d Cir. 2013)...................................................31, 47

United States v. Madori,
    419 F.3d 159 (2d Cir. 2005)..................................................41, 54

United States v. Meregildo,
    920 F. Supp. 2d 434 (S.D.N.Y. 2013).....................................34, 52

United States v. Osorio,
    929 F.2d 753 (1st Cir. 1991) .......................................................34

United States v. Owen,
    500 F.3d 83 (2d Cir. 2007)....................................................37, 50

United States v. Payne,
    63 F.3d 1200 (2d Cir. 1995)..................................................37, 51

United States v. Petrillo,
    821 F.2d 85 (2d Cir. 1987)....................................................37, 50

iv

United States v. Quinn,
    537 F. Supp. 2d 99 (D.D.C. 2008) ....................................................33

United States v. Risha,
    445 F.3d 298 (3d Cir. 2006)...........................................................33

United States v. Rodriguez,
    496 F.3d 221 (2d Cir. 2007).............................................................34

United States v. Stofsky,
    527 F.2d 237 (2d Cir. 1975)....................................................39, 42, 53, 54

United States v. Wallach,
    935 F.2d 445 (2d Cir. 1991)......................................................39, 53

United States v. Walker,
    289 F. Supp. 3d 560 (S.D.N.Y. 2018)........................................38, 51

United States v. Wong,
    78 F.3d 73 (2d Cir. 1996)..........................................................37, 50

Wiercinski v. Mangia,
    57, Inc., 787 F.3d 106 (2d Cir. 2015) ............................................38

## STATUTORY AND OTHER AUTHORITY:

18 U.S.C. § 3231 ..................................................................................1

18 U.S.C. § 3742 ..................................................................................1

28 U.S.C. § 1291 ..................................................................................1

Fed. R. Crim. P. 33.......................................................................*passim*

## JURISDICTIONAL STATEMENT

The District Court held jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the Defendant was charged with an offense against the laws of the United States. The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was filed on February 7, 2024 (SA-269)[1] from an order denying motion(s) for new trial based on newly discovered evidence dated January 25, 2024 (SA-266) denying the Appellant's motions pursuant to Fed. R. Crim. P. 33.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in denying the Appellant's motion for new trial based on newly discovered evidence?

> A. Whether the Court should reverse the district court's ruling on Teman's Rule 33 motion regarding new evidence as to 18 Mercer and in not holding a hearing?
>
> B. Whether the Court should reverse the district court's ruling on Teman's rule 33 motion regarding new evidence as to Soleimani and in not holding a hearing?

---

[1] On September 25, 2024, the Court entered an Order granting the Appellant's Motion to Rely on his prior appeal Appendix in 2d. Docket Number 21-1920. The Appellant is also filing a Supplemental Appendix. The symbols "A" and "SA" refer to the Appendix in Docket Number 21-1920 and the Supplemental Appendix, respectively, followed by the pertinent page noted.

## STATEMENT OF THE CASE

### I.    FACTS

Teman is the founder of JCorps and GateGuard, Inc. (or "GateGuard"). JCorps is a seven-city international volunteer organization that has led thousands of young Jewish adults to volunteer in children's hospitals, senior centers, soup kitchens, animal shelters, parks, and more.  A-2319. GateGuard, for its part, is a "cutting edge" technology company that provides intercom devices for multi-tenant properties and related services to both the tenants that live in those apartment buildings and the landlords and owners of the properties. A-716:24; A-870:8-11.  The GateGuard system includes a face-recognition entry panel, an intercom, and an artificial intelligence "virtual doorman" + camera system.  A-1856.

The GateGuard intercom is connected to a website panel that enables visual tracking of entrances into a customer's building, permitting the customer to see time-stamped logs and photographs of who was entering the building at a given time, thus providing value to the company far beyond a standard intercom.  A-511:2-9. The website homepage contains a form through which the customer provides its contact information and information regarding its properties and also, as is customary for on-line businesses, contains a link to GateGuard's Terms and Conditions the customer must check to signify its agreement with the terms and

2

place an order for desired products and services. A-872:21-25, A-873:1-9. Teman includes a link to this web landing page, at Gateguard.xyz, on official correspondence with clients. A-1856. The Terms and Conditions expressly provide that the customer agrees to updates to the terms and other documents incorporated by reference without any requirement for express agreement to these updates. A-1809. The Terms and Conditions also contain a link to payment terms authorizing the use of "remotely created checks" – or RCC's – in the event of customer defaults or to secure payment of a device removal fee. A-1884 (Permission to Make Bank Draws and Other Account Draws). See Id.

Teman's conviction(s) revolved around three distinct RCC narratives involving three different customers: Elie Gabay (or "Gabay"), Bonnie Soon-Osberger (or "Soon-Osberger") and Joseph Soleimani (or "Soleimani"). In note, Teman had hundreds of customers. (A-871) The different narratives were incoherently combined in single counts based not on any similarity in the relationships but the timing of Teman's deposit of RCC's to collect what he believed were contractually enforceable customer debts. Thus, Counts I and III involved the deposit of 27 checks on April 19, 2019 against the accounts of entities related to Gabay and Soleimani and Counts II and IV involved the deposit of two checks against the accounts of entities related to Gabay and Soon-Osberger in March 18, 2019. Thus, the Gabay relationship was included in each count.

3

## A. **Elie Gabay**

In 2016 or 2017, Gabay, managing director of a property management company, Coney Management ("Coney"), met Teman at a trade show. A-446:2, A-445:25, A-449:4-6. Coney manages a Manhattan property located at 518 West 204, owned by an LLC identified by the building's address, 518 West 204 LLC. A-447:16-19, A-447:25-A-448:1-3. Teman first marketed to Gabay a product called SubletSpy that helped property owners and managers detect illegal uses of their properties. A-449:11-14. Gabay then subscribed for the GateGuard intercom system, with the idea that Coney would use GateGuard's existing intercom suite at a single location and roll out an upgraded 2.0 version out across the company's property portfolio. A-451:21-25, A-452:1-5.

On January 19, 2018, Teman sent Gabay an email indicating that Coney would be invoiced $3,600 for the initial invoice installation, to be credited against monthly fees from the 2.0 roll-out, together with a security deposit of $849. A-1789. Gabay took issue with the $849 and requested a copy of the invoice, which had not been attached to the initial email. A-1788.

Teman clarified in response that the $849 would be reflected as "0" (*i.e.*, not charged) and attached the requested invoice. See Id. The cover email expressly requested payment through GateGuard's website portal and the invoice reminded Coney that the order was subject to GateGuard's Terms and Conditions, a link for

which was provided to the left of the amount due.  A-1790.  The Terms and Conditions expressly reference GateGuard's Payment Terms, which provide for the use of RCC's to recover unpaid debts.  A-1884.

The invoice also expressly noted the limitations of the initial version of the Intercom suite and the buyer's acceptance of the online Terms and Conditions.[2] Gabay testified that he did not recall whether he clicked on the Terms and Conditions link as requested in connection with the initial invoice.  A-456:17-18. On January 28, 2018, Michael Haas ("Haas"), one of the other owners of the 518 W. 204 LLC, paid in full the $3,600 invoice, which states that "Buyer accepts the Terms and Conditions at gateguard.xyz."   A-549: 19-20, A-1725, A-1790, A-1790.2.   The Government did not obtain Haas's testimony at trial, but rather produced an affidavit in which Haas swore he was not familiar with GateGuard. A- 1727, A- 327, A-1157-58.  In addition, the introductory paragraph to Section 5 of the Terms and Conditions contained the link to specific payment terms, including the use of RCC's, to which neither Gabay nor Haas objected, and immediately below Section 5 of the Terms and Conditions, which Gabay had requested the addition of the word "reasonably."  A-1801.

---

[2] The invoice contained, on the bottom left, opposite the price, the following language:
We are installing Version 1.0 ahead of 2.0 being available (~90 days). Client understands 1.0 device does not have 4G, IR, battery, etc.
 https://gateguard.xyz.
**Terms** Buyer accepts terms & conditions at https://gateguard.xyz.  A-1790.

The Version 1.0 of the Gateguard Intercom encountered connection problems. A-471:11-16. Gabay relayed his concerns to Teman over the next six weeks and many of the problems were resolved. A-477: 2-9. Indeed, as of March 13, 2018, Coney was considering an investment into GateGuard. A-1795. On this date, Teman emailed Gabay and stated he was providing a template for an order of twenty intercom panels, a proposed convertible note for a $40,000 investment into GateGuard, and his banking details for payment of the note. See Id. The government did not offer the attachments to the email into evidence and there was no questioning from the Court as to the status of the attachments.

In response, on March 25, 2018, Gabay provided comments on the GateGuard Terms and Conditions, but not on the Payment Terms. A-1797-A1814. Teman responded that these changes appeared "mostly workable," but explained the reasoning behind certain provisions that were important to GateGuard, including the need for a 10-year contract. A-1816. Teman followed up with an email stating "Updated with tracking. Most changes made as requested." A-1822.

Gabay did not respond to Teman's explanation or updated Terms and Conditions but shared "the general feedback he was getting" that the entire GateGuard project should be placed on hold. A-473:8-9, A-1815. Teman countered that there was an unpaid invoice relating to an intercom panel that had been installed on January 19, 2018. A-1820 at 1. GateGuard's unpaid invoice

6

referenced the "full price" of the installed intercom panel, installation fees, and one year of service fees. A1828. The total amount invoiced for the initial panel, again with a reference to GateGuard's Terms and Conditions, was $18,286. A-1828.

The Government presented the foregoing facts in a manner that made logical narrative flow extremely difficult. The prosecution sought to elicit testimony that Gabay had not "signed" the online Terms and Conditions (which were not designed to be signed, but affirmatively assented to by a checkbox); that he believed he did not have an "agreement" about the Terms and Conditions (where assent was provided by a click-through mechanism customary in on-line contracts); that Teman had not sent him a copy of the "website" with the Payment Terms (when the link to the Payment Terms was immediately above a line on which he had commented); and that he "never saw" the device removal language in the Payment Terms and Conditions. A-465:12-13, A-478:12-15, A-469:15-16. However, despite the Government's leading questions, Gabay testified that he did not "recall" whether he clicked on the Payment Terms. A-469:2-5.

For the remainder of 2018, relations between Teman and Coney deteriorated. A-493:14. Teman repeatedly warned customers, including Coney, that if they removed the GateGuard device, they would be subject to a device removal fee, which even the government conceded. A-497:13-18, A-865:4-5.

7

On March 28, 2019 Teman deposited a check for $18,000 drawn on Coney's account at Signature Bank ("Signature") for the property in question, identified as 518 W. 205 LLC[3], A-1728, together with a separate check, A-1729, drawn on the account of 18 Mercer Equity, Inc., a different customer described below, *via* mobile deposit to his BOA account. A-335:21-24. Some days later, Gabay was contacted by Signature and asked whether he had authorized the $18,000 check deposited by Teman. A-494:12-4. Gabay responded that he had not. A-495:3-4. Haas, as noted, submitted a false affidavit stating he did not even know who GateGuard was. *See supra* at 8 and Note 2. At that point, Signature initiated a "chargeback," leaving Teman's account with a negative balance. A-345:16-22, A-347:10-11, A-348:5-9.

According to Karen Finocchiaro, a BOA vice-president and senior fraud investigator ("Finocchiaro"), the Internet Protocol (or IP) address associated with a mobile device corresponding to Teman's deposit, 74.203.64.198, was linked to a physical address in New York, New York. A-338:11-16, 20-21, A-339:7-12. However, no expert testimony was provided connecting this IP address to the physical location of Teman's phone and publicly available information shows that

---

[3] The check contained a typo because the property was actually located at 518 W. 204, held by 518 W. 204 LLC. The government made much of this typo, highlighting the check in red next to a "good" check for maximum visual effectiveness. A-1726.

the IP address was monitored by a company called Level 3 that exclusively monitors fixed line devices.

Approximately a month after the chargeback of the $18,000 check, Teman attempted to cash three additional checks drawn on 518 W. 205 LLC for a total amount of $33,000,5 but the account had been closed and the checks were returned uncashed. A-504:13-16. Neither Gabay, Signature nor BOA suffered any loss from the attempted deposit of the three returned checks.

### B. Bonnie Soon-Osberger

Like Gabay, Soon-Osberger met Teman at a trade show. A-556:19-24. Soon-Osberger was a member of the Board of Directors and Treasurer of a condominium cooperative corporation, 18 Mercer Equity. Inc. that owned a cooperative condominium located at 18 Mercer St. ("18 Mercer") in Manhattan. A-552:21-25, A-553:1-8, A-554:9-13. Among her duties, Soon-Osberger was responsible for soliciting bids and obtaining devices for 18 Mercer. A-554:21-23. In October, 2017, Soon-Osberger attended a condominium trade show at which she was looking for vendors to supply a new intercom system for 18 Mercer. A-556:21-24, A-557:1-5. GateGuard had a booth at the trade show and Soon-Osberger, attending the trade show with her husband and also the President of Mercer, was attracted to the GateGuard Intercom panel because of its "smart" features. TR A-557:6-8, 14-16, 19-21.

9

According to Soon-Osberger, Teman discussed a "price point" for the GateGuard panel of $2,500. A-558:1-2. After the trade show, Soon-Osberger contacted Teman, indicated she was interested in the GateGuard intercom, and requested information on the product. A-561:8-10. Teman directed Soon-Osberger to the GateGuard website, where he told her she could sign up and order the product. A-561:10-15. Soon-Osberger testified that she "went through all" of GateGuard's Terms and Conditions. A-559:5. Teman expressly told her that the contract for the GateGuard Intercom panel was created through the company's on-line Terms and Conditions. A-561:20-24. Soon-Osberger testified that it was likely she likely downloaded the Terms and Conditions on March 23, 2018. A-560-561:1-5, A-1834-55, GX-441. However, Soon-Osberger testified that she did not click on the Payment Terms in Section 5. A-565:1-5.

Notwithstanding the Terms and Conditions, which expressly state that the customer is simply paying for rights to use the panel and its associated intellectual property, Soon-Osberger testified that her "recollection" was that she would purchase the panel outright because Teman gave her a "price." A-562:21-25. This does not explain why Soon-Osberger would go through and then download the entire Terms and Conditions, but not read the Payment Terms. Soon-Osberger testified that she had previously only executed agreements with a physical signature, implying that she was unfamiliar with customary online terms and

10

conditions.    A:563:19-24.    The Court can take judicial notice that online "clickwrap" and "browsewrap" agreements are customary.  See Meyer v. Uber Techs., Inc., 868 F.3d 66 (2d Cir. 2017).

Soon-Osberger also provided the Terms and Conditions to the other members of the 18 Mercer Board and to Stephanie Phillips, the President of 18 Mercer, who, according to Soon-Osberger "looked at" the document.  A-684:24-25, A-585:1-11.  Soon-Osberger emailed Teman with specific questions on the GateGuard Terms and Conditions. A-1860.  She did not, however, provide any comments on the Payment Terms, despite the prominent placement of the link to the terms in Section 5 of the Terms and Conditions. In response, Teman agreed to limit price increases, but otherwise explained the reasoning behind the clauses without modifying the language. A-1859.  After receiving Teman's response, Soon-Osberger stated that Teman had addressed 18 Mercer's concerns.  A-1858. Appellant provided an invoice for a total of $3,947 that included a "cooperator show price" for the GateGuard intercom panel, installation and one-year's prepaid services. A-1833.

The invoice expressly stated that "Buyer accepts terms and conditions at gateguard.xyz." The Terms and Conditions notice was on the same line as the amount to be paid and clearly visible.  The invoice, with its express limitation to the Terms and Conditions on GateGuard's website, was reviewed by 18 Mercer's

11

management and, on April 4, 2018, sent to 18 Mercer's property management company, Crystal Real Estate Management, Inc. ("Crystal Management"), who paid the invoice in full. TR A-572:23-25, 573:1-7, A-1831-32, A-1838. Following payment, GateGuard installed the panel at the Mercer St. condominium. A-573:10-12.

According to Soon-Osterberger, 18 Mercer encountered difficulties with the GateGuard intercom, which Teman explained resulted from the building's poor Internet connection. A-574:2-10. For the remainder of the year, 18 Mercer and GateGuard attempted to resolve the connectivity issues. A-574:11-22. In January 2019, 18 Mercer decided to "move on" from GateGuard. A-574:23-25. In early January, 2019, Soon-Osterberger sent an email informing Teman that 18 Mercer intended to remove the GateGuard intercom, to which Teman responded that GateGuard would enforce its rights to a removal fee. A-1866. Soon-Osberger recalled several additional emails in which Teman threatened to enforce GateGuard's rights. A-577:24-25, A-578:1.

In light of Teman's position, Soon-Osberger provided the GateGuard Terms and Conditions, referred to as the "contract," to Jacqueline Monzon ("Monzon") at Crystal Management, who in turn forwarded the contract to the entity that would replace GateGuard, Academy Intercom, Inc. ("Academy"). A-1862-A-1865. Academy reviewed the Terms and Conditions and refused to proceed with

12

removing the intercom because of legal liability. A-1863-A1864. After receiving the contract, Crystal Management requested indemnification for itself and Academy if the removal work were to be authorized. A-1862. The Government did not produce evidence of any indemnification agreement and did not produce evidence as to when or under what circumstances the GateGuard device was removed.

However, after GateGuard had put 18 Mercer on notice that it intended to enforce its right to an $18,000 device removal fee; after Academy had refused to effect the removal; and after Crystal Management had demanded indemnification if the device were removed, on or about January 10, 2019, 18 Mercer removed the device. A-602:12, A-603:21. On March 28, 2019, Teman deposited an RCC for the device removal fee in the amount of $18,000, which Soon-Osberger testified was "unauthorized." A-578:4-11. Meanwhile, Crystal Management had terminated its management contract with 18 Mercer on or about March 15, 2019. A-612:1-3. At the end of the month, Gina Hom ("Hom"), who, together with Monzon, was one of the two authorized signatories for Crystal Management, noticed the GateGuard RCC, which she claimed not to recognize, and called Signature to place a hold on the check. A-611:18-19, A-612:13. Hom testified she did not ask anyone on the 18 Mercer Board whether the check was authorized. A-612:22-25.

13

Signature then processed a "chargeback" to BOA, leaving Teman's account with a negative balance. A-345:16-22, A-347:10-11, A-348: 5-11. The "chargeback" was combined with the chargeback for the $18,000 check drawn on Coney's account. A-348:6-9. BOA honored both chargebacks, leaving Teman's BOA account overdrawn by a total of $29,036.56. A-348:15. This negative balance was subsumed by the RCC deposits involving the last customer discussed below. As a result, neither Signature nor BOA suffered any independent loss in connection with the Soon-Osberger or Gabay checks.

### C. Joseph Soleimani

In late 2016, Soleimani, one of the owners of ABJ Properties ("ABJ"), a property management company that managed two real estate companies, ABJ Lennox, LLC ("ABJ Lennox") and ABJ Milano LLC ("ABJ Milano"), reached out to Teman to discuss his SubletSpy product. A-624:8-14, 21-22; A-626:3-8. Shortly after meeting Teman, ABJ subscribed for Teman's SubletSpy service. A-626: 9-12. Soleimani then asked Teman to give him a "demo" of the GateGuard Intercom system at Soleimani's office. A-723:6-9, 724:13-23.

At the office "demo," Soleimani had an opportunity to review not only the physical Intercom system but also GateGuard's "online interface." A-725:5. GateGuard's only interface includes a landing page with references to its Terms and Conditions. After the office demo, Soleimani agreed to have seven GateGuard

14

intercoms installed at ABJ properties.   A-726:15-20.  Soleimani testified that he "did not recall" whether he signed up for the GateGuard products and services through GateGuard's online platform.  A-726:8-13.  However, he acknowledged using the online platform, which requires acceptance of the online terms to sign in. A-727:5-6.

After Soleimani signed up for the seven GateGuard intercoms, ABJ used the system for "quite some time," during which ABJ had continuous access to the GateGuard online interface.  A-726:21, A-727:2-6.  In March, 2017, Soleimani received invoices for the seven intercoms and related services.  A-728:2-9; A-1777-A-1784.  The invoices contemplated delivery of the intercoms for a heavily discounted up-front cost of $499,9 an installation fee of $650, a six-month service charge of $594 and a three-year contractual commitment.  A-1777-A1784.  This is in reference to a discounted up-front initial price for a temporary device of $3,600 and a reference to a discounted up-front price of $2,500 for installation of an initial device.  The particularly heavy discounting for Soleimani must be seen in the context of the parties' negotiation of a separate, much larger, order covering 60 buildings.

As with the invoices for Gabay and Soon-Osberger, all seven invoices expressly stated that they were subject to the GateGuard online Terms and Conditions available at https://gateguard.xyz/legal/terms/.php.   However,

15

Soleimani stated that "he did not see" the reference to the online Terms and Conditions. A-728:12.

After the system went live, there were several problems with the GateGuard system, which Teman attributed to connectivity issues, and, apparently, an unwillingness of ABJ to pay certain invoices. A-733:4-17, A-1928. In frustration, on March 9, 2018, Teman sent ABJ an email stating that in light of client's nonpayment, he "was done" and GateGuard would be "shutting down" in part because of ABJ's dangling of "fake orders" and "fake investments." A-1928-A-1929. Benjamin Soleimani, Soleimani's brother and the other owner of ABJ, responded by entreating GateGuard not to shut down and imploring GateGuard to work together with ABJ to resolve any issues they were having. A-1928, A-715:2-3. Specifically, Benjamin Soleimani pleaded with Teman to come to dinner and discuss matters, stating: "Please don't do anything yet with the system. Let's keep it going how it was before the update. And let's discuss next week what we can do together to improve it." A-739:3-6.

For much of the rest of the year, relations between Soleimani and Teman oscillated between mutual recriminations and an attempt to patch things up and seek common ground for the installation of the GateGuard 2.0 devices. On the one hand, billing disputes continued to plague the parties' relationship. On September 6, 2018, Ariel Reinitz (or "Reinitz"), Teman's corporate attorney, contacted

16

Soleimani to obtain payment of outstanding fees. A-1887. In response, ABJ requested that GateGuard discontinue service. See <u>Id.</u> Reinitz responded by reminding Soleimani of the GateGuard Terms and Conditions, referenced in the initial GateGuard invoices and attached to Reinitz's email. See <u>Id.</u> However, during the Soleimani cross-examination, the defense did not have a copy of the invoice and the Court did not permit cross-examination of Soleimani on the email, which drew Soleimani's attention to the specific online terms, identified in Reinitz' email with the hyperlinks "here" and "here." A-745:6-25. These specific online terms expressly referenced both the Terms and Conditions and the Payment Terms that authorized the use of remotely created checks for payment of outstanding fees.

On the other hand, at the same time, ABJ was considering installing an upgraded, second generation, version of the GateGuard system across 60 Buildings in the ABJ portfolio. A-748:14-24, A-750:12-14. As part of its purchase, ABJ sought a general release as to fees claimed by GateGuard up to that time, which it discussed with Reinitz. A-1889. Soleimani also testified that he continued to receive multiple emails from Teman during this time period, but these were not produced by the Government. A-751:4-10.

The negative aspect of the Soleimani/Teman relationship eventually came to dominate. In early January, 2019 Teman began discussions with Reinitz about using RCC's to recover amounts owed from ABJ. A-1872. At that time, Reinitz

17

discouraged Teman from using RCC's to recover debts from ABJ without warning, saying he thought this would be a "bad idea." See Id. After an extended back and forth over several months, Reinitz concluded, "ok invoicing and then collections is fine." A-1876. Following this exchange with Reinitz, Teman sent ABJ an invoice for, among other things, the device removal fee for seven devices, past due fees for the seven devices under the terms of the initial invoices, an attorney collections fee, and a device reinstallation fee. A-1775. The invoice also included amounts allegedly owed for 60 devices, apparently relating to the additional intercom panels the parties had been negotiating since October 2018.10 The prosecution did not introduce any evidence of Soleimani disputing this invoice.

Two weeks later on April 19, 2019, at the BOA Lincoln Rd. Branch in Miami Beach, Florida, Teman deposited a total of 24 checks drawn on ABJ's bank, JP Morgan Chase ("JP Morgan") against amounts invoiced for a total of $264,000. A-1733-A-1756. Teman also deposited three additional checks drawn on Coney's 518 W. 205 LLC account with Signature, A-1730, A-1731, A-1732,12 but the account had been closed and these checks were not processed for payment. With these three checks, the total amount deposited on April 19, 2019 was $297,000, A 357:19-20, and the ending balance on that date in the GateGuard account was $271,803.12. A-358: 9-10.

18

On April 16, 2019, once the seven-day hold was lifted, Teman transferred $225,000 to GateGuard's parent company, Friend or Fraud, Inc. A-361:4-8. Friend or Fraud then transferred $4,500 to Teman's personal account. A-363:6-13. $180,000 was transferred to an account ending in 1046, identified as the account for Touchless Labs, LLC. A-363:18-20, A-344:4-7. On April 29, 2019, $125,000 was transferred back to the Friend or Fraud account. A-363:23-25. Two wire transfers were then made to suppliers in China. A-364:12-18. On May 8, 2019, Teman withdrew $4,000 in cash from BOA at 1 Penn Plaza in Manhattan. A-365:3-7. The Government did not provide testimony as to how this $4,000 related to any of the RCC's at issue. Teman had deposited a check for $4,096 unrelated to the RCC's on April 19, 2022. See GX113, A-1657.1, at 483067038085.

According to Finocchiaro, all of the $297,000 checks were subject to a chargeback. A-367:17-20. However, this was not quite correct. Finnocchiaro separately testified that only the ABJ (Soleimani) checks totaling $264,000 were subject to a chargeback. A-368:3-4. Gabay's 514 W 208 LLC account had been closed and the checks could not be credited to this account. The testimony was exceedingly confusing because Finnochiario testified that the $264,000 chargebacks covered all 27 checks (with a total value of $297,000), which only works arithmetically if the three Gabay/West 205 checks totally $33,000 were not subject to a chargeback. Teman's GateGuard account was then closed, with a

19

negative balance of $260,319.81.  A-368:18.  The Friend or Fraud account, which had a positive balance of $8,386, and the Touchless account, which had a positive balance of $86,558.18, were also closed.  A-370:4-19.  An additional account with a positive balance of $13,447.37 was not discussed at trial but was disclosed on the eve of sentencing, when it appeared that, instead of using these funds, which were available for offset to reduce the amount of its loss, BOA returned the funds to Teman in February 2021.  A-2261.  The Friend or Fraud and Touchless balances were sent to Teman who returned them to BOA.  A371:20-21.  Once returned to BOA, the positive balances were sent to a BOA "hold harmless" account.  A-370:22-25.  Finocchario then testified that BOA was unable to offset the Friend or Fraud and Touchless positive balances against the GateGuard negative balances because the corporate entities all had different tax identification numbers.  A-372:21-25, A-373:1-4.  The Government did not provide any correspondence between BOA and Teman relating to the various positive balances.

Ultimately, because only BOA suffered any losses in connection with the three customer relationships involved in the Government's prosecution of Teman, *USA v. Teman* resolves into *Bank of America v. Teman*, a case that should have been brought in a civil proceeding based on the application of Meyer, 868 F.3d at 66.

## II.   **PROCEDURAL HISTORY**

On June 20, 2019, Magistrate Judge Sarah Netburn issued an arrest warrant based on a complaint charging bank fraud.  See United States v. Teman, Case No. 19-MAG-5858.  A-46.2.  On July 3, 2019, Teman was arrested pursuant to the warrant.  See United States v. Teman, Case No. 1:19-mj-03082-JJO-1 (S.D. FL).

On September 26, 2019, a grand jury returned a one-count indictment for bank fraud.  A-49-A-52.  On November 12, 2019, a grand jury returned a superseding indictment against Teman charging two counts of bank fraud and two counts of aggravated identity theft.  A-96.1.  Count 1 of the superseding indictment was dismissed by the trial court on December 20, 2019.  A-97-A-120.  On January 3, 2020, the government filed a six-count superseding indictment charging two counts of bank fraud, two counts of wire fraud, and two counts of aggravated identity theft.  A-121-A-128.  On January 10, 2020, the district court held a pre-trial hearing where various motions *in limine* were addressed.  A-137.1-137.95.

On January 14, 2020, the government informed the trial court that it would not pursue counts 5 and 6 at trial.  A-136.96.  Following a five-day trial, on January 29, 2020 Teman was convicted on all counts.  A-1298.1-1298.2.  The district court granted Teman bail pending appeal.  A-1287-1294.

On February 26, 2020, Teman moved for an acquittal or, in the alternative, a new trial under Rule 29 and Rule 33.  A-1437-1472.  While the motion was

pending, Teman filed a motion for a new trial on the basis of undisclosed *Brady* and *Jencks Act* material. A-1473-1497.

On June 5, 2020, the district court entered an order denying all of Appellant's posttrial motions and setting the case for sentencing. A-1937-2043. Sentencing was deferred on multiple occasions. A-2044, A-2107-2108, A-2111-2112. On April 28, 2021, Teman then filed a Motion to Dismiss and a Motion for Vacatur and Bail Pending Appeal. A-2196-A-2222.

On May 12, 2021, Teman filed the Declaration of Richard M. Fraher (the "Fraher Dec'l"). A-2226-2235. Fraher opined that, contrary to Finnocchiaro's sworn testimony at trial, BOA had remedies that would enable it to reach the funds in Teman's personal, Friend or Fraud, or Touchless accounts. A-2232. Teman also moved for Judge Engelmayer's recusal. DE230. On July 9, 2021, the district court denied Teman's motions and set sentencing for July 28, 2021. A-2247-2315. At sentencing, Teman was ordered to pay restitution to BOA of $259,340.32, incur a forfeiture penalty of $330,000, and serve a year and a day in prison. A-2425-2430.

On September 15, 2023, Teman filed a motion to vacate judgment and for new trial under Rule 33. (SA-150) Also, on September 21, 2023, Teman filed a motion for new trial under Rule 33 to vacate his convictions based on newly discovered evidence. (SA-173)

On January 25, 2024, the district court entered an order denying Teman's Rule 33 motions at (SA-146, SA-150-210, SA-266). On February 7, 2024, Teman filed a notice of appeal of the denial of his Rule 33 motions. (SA-269)

## SUMMARY OF THE ARGUMENT

The district court erred in denying Teman's Rule 33 motion(s) because the government's failure to furnish the defense with the missing emails from Pecot connected to 18 Mercer showing that it was aware of the Terms and Conditions permitting Teman to make the deposits and also as to Soleimani of ABJ Properties, which documents would show in part that he had an incentive to lie on the stand when he had entered into a contract with GateGuard's competitor MVI Systems, LLC with large financial incentives for Soleimani and but not limited to that Soleimani knew that ABJ's internet connection was to blame for GateGuard being offline and which would reasonably place the matter in such a different light as to undermine confidence in the verdict.

## ARGUMENT

## POINT I

## THE DISTRICT COURT ERRED IN DENYING TEMAN'S RULE 33 MOTIONS.

### A. The Court Should Reverse the District Court's Ruling on Teman's Rule 33 Motion Regarding New Evidence as to 18 Mercer and in Not Holding a Hearing.

### I. FACTS

On August 20, 2021, Teman wrote to the district court that he had discovered new evidence of his innocence and that he believed the case against him should be dismissed. (DE395) The new evidence consisted of a sworn letter from Shelly Pecot (or "Pecot"), a Board member of 18 Mercer, one of the three entities against whom GateGuard had drawn remotely created checks (or "RCC's") to satisfy unpaid fees (DE395), together with previously undisclosed email correspondence between a key government witness, Soon-Oseberger, and another 18 Mercer Board member, Margaret Crimmins (or "Crimmins"). (DE395)

Pecot's sworn letter, which is attached as Exhibit C to DE395 affirmed that she knew that 18 Mercer was subject to an $18,000 device removal fee and that GateGuard believed it could draw against 18 Mercer's account to cover this fee. The district court acknowledged receipt of the correspondence from Teman and understood he was seeking a new trial. (DE265) On February 18, 2022, Teman notified the district court of his intention to file a Rule 33 motion based on newly

24

discovered evidence. SA-156. The same day said motion was filed, the district court responded that its intention was to defer ruling on any *pro se* motions until after the resolution of Teman's pending direct appeal. (SA-148-49)

On May 11, 2023, Teman's direct appeal was heard by this Court in <u>USA v. Teman</u>, Case No. 21-1920. On June 8, 2023, this Court affirmed the judgment of the district court. (DE150) On August 18, 2023, this Court issued a mandate affirming the judgment of the district court. (DE380) On September 15, 2023, Teman filed a Rule 33 motion (SA-150), based in part on the new evidence, which the district court had ruled should be considered simultaneously with any Rule 2255 motion that was being prepared.

Teman's Rule 33 motion concerns a sworn letter executed by Pecot and the Ms. Crimmins's emails, which bear on Teman's innocence, the truthfulness of key government witnesses and the government's compliance with disclosure obligations. The core theory at trial was that Teman's customers did not know about and had never approved GateGuard's right to draw RCC's against his customers' accounts for fees and services that were agreed to within GateGuard's Terms and Conditions. After sentencing, believing the government had failed to produce evidence that would undermine its core theory, Teman contacted Pecot, a Board member from 18 Mercer, which as noted was one of the three entities against whose accounts RCCs were drawn by Teman. In response, Pecot provided

25

a sworn letter stating that Teman had warned her and other shareholders that the GateGuard Terms and Conditions contemplated an $18,000 device removal fee and the use of RCCs to collect amounts owed.

Pecot provided two emails to Teman, with the following caveat:

Ari, I have to send this to you because it is the right thing to do. Please don't make me sorry I did it. I wish you all the best. I appreciate very much that you explained and apologized for your prior actions.

(SA-110, SA-150)

The first email provided by Pecot was dated October 28, 2018, from "Margaret," whom Teman knew to be Ms. Crimmins, an 18 Mercer shareholder and Board member. (DE395) This email was never provided to Teman by the government or Soon-Osberger and or Hom, who had been subpoenaed by Teman's defense team. (SA-173-74) Neither Soon-Osberger nor Hom responded to their subpoenas and this should be investigated. (Sa-173-74) It constitutes as material impeachment evidence because Soon-Osberger had testified at trial that she was "shocked" three months later when Teman reminded her, Pecot and Jackie Monzon, who was the President of 18 Mercer's management company, that the device removal would incur an $18,000 fee. (A-576, A-162). The Ms. Crimmins email indicates that Soon-Osberger had already been warned months earlier that she would incur "legal liability" by removing the GateGuard device.

26

Even more importantly, Ms. Crimmins statement that Soon-Osberger was "legally liable" for her conduct in removing the GateGuard underscores that Soon-Osberger had been expressly told, not just by Teman, but also by a fellow Board member, that there was "legal," which in this case can only mean "contractual," basis for liability. This contractual liability can only stem from the GateGuard Terms and Conditions, at trial.

The Ms. Crimmins email thus via Teman's argument undermines the government's core theory: that Teman's commercial counterparts did not know about and thus could not have authorized GateGuard's enforcement of its contractual rights. As such, Teman's argument is also that the removal fees charged against the ABJ entities operated by Soleimani, who was in control over one of GateGuard's other customer's ABJ Properties, would have appeared in a much different light if the jury had heard testimony or seen documents showing or even tending to show that an $18,000 device removal fee was something that GateGuard customers knew about and for which they believed they had contractual legal liability. In note, the communication chain between 18 Mercer and Teman shows that Teman reminded 18 Mercer of the contract terms and that both Hom and Soon-Osberger were aware of the removal fees even though they denied knowledge at trial. SA-110-19.

The second email sent by Pecot provides additional evidence tending to undermine the government's core theory and establish Teman's innocence. In this email, on December 3, 2018, again long before the email that allegedly "shocked" Soon-Osberger, Ms. Crimmins wrote:

> By 'the board' so you mean Bonnie and Stephanie? I'm a board member and I have no idea where things stand with the intercom.
> **The last communications from Ari Teman:**
> 10/5 An e-mail from Ari stated that there was a 10-year contract and he would put a lien on the building.
> 10/22 The next e-mail from Ari stating that it would cost $18,000 to disable the device and $10,000 in collections if he wasn't paid in full.
> **The last communication from Bonnie.**
> 10/22 An e-mail to Ari stating that he would hear from our attorney that week.
> And that's the only information the shareholders have. Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?

(SA-108-109, SA-151)

This email would have been of great importance to the defense. First, the email stresses that the Board members who were involved in the dispute with GateGuard included not only Soon-Osberger, but also Stephanie Phipps, who knew of the contractual issues surrounding the GateGuard device removal and had apparently not been kept fully informed. Second, Soon-Osberger knew there was a contractual issue and potential litigation, not because of the threat from Teman, but because of a demand for information from a fellow Board member, who cannot

28

have been alone in wanting answers – many months before GateGuard exercised its right to draw 18 Mercer's account with an RCC.

Second, Ms Crimmins copied Ms. Hom of 18 Mercer's management company, Crystal Management on her email. Yet, Ms. Hom testified at trial that she was unaware that 18 Mercer had a contract with GateGuard and that she believed the extent of the relationship between GateGuard and 18 Mercer was that 18 Mercer had hired GateGuard to install a new intercom system. (A-615-16). The relevant exchange between Teman's counsel and Ms. Hom on cross-examination was as follows:

Q.     Ma'am, you were aware that Mercer had a contract with GateGuard, correct?

A.     No.

Q.     You weren't aware of that?

A.     I was not aware they had a contract. I know that they had an agreement on them.

Q.     Okay.

A.     As far as I know.

Q.     Well, what's your understanding of the agreement that you believed Mercer had with GateGuard?

A.    That they hired – 19 Mercer hired GateGuard to install the new intercom system.

Q.    Okay.  But that was the extent of your understanding of the business relationship between Mercer and GateGuard?

A.    Correct.

The second Ms. Crimmins email proves that Ms. Hom was not being truthful.  The email establishes that Ms. Hom knew the relationship with GateGuard involved an alleged 10-year contract, an $18,000 device removal fee and potential litigation – far more than a simple agreement to install an intercom.  Moreover, it is simply not plausible that the representative of 18 Mercer's management company would have ignored an email as important as this one from a visibly angry shareholder.  Ms. Hom must have engaged in further conversations and exchanges about the $18,000 device removal fee and GateGuard's remedies, destroying her testimony, central to the government's theory, that GateGuard's RCC to enforce the $18,000 fee came out of the blue, without any warning, "shocking" her into requesting a chargeback.  (A-612).

The email makes clear that there are almost certainly additional undisclosed emails between the Board members and Crystal Management concerning the GateGuard Intercom, the device removal fees and the remedies contemplated in the GateGuard Terms and Conditions.  Ms. Crimmins sharply raises a host of

30

questions ("Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?").

Perhaps, most importantly, the back and forth about the provisions of the GateGuard contract, combined with the acknowledgement and awareness that 18 Mercer was "legally liable" for a device removal fee under the GateGuard Terms and Conditions underscores the fundamentally commercial, if acrimonious, nature of this entire matter. There was a contract, there were fees and remedies, there was a dispute – the lifeblood of the commercial practice in New York Supreme Court – not a crime to be punished with forfeiture, restitution and incarceration. The fundamental challenge to the government's case was undermined by the government's limited production of material information and the defense's lack of critical evidence.

## II. <u>STANDARD OF REVIEW</u>

This Court reviews the denial of a Rule 33 motion for an abuse of discretion. See <u>United States v. James</u>, 172 F.3d 79, 107 (2d Cir. 2013). The same standard of review applies to the district court's determination on whether to conduct a hearing on the motion. See <u>United States v. DiTomasso</u>, 932 F.3d 58, 70 (2d Cir. 2019). When considering a motion under Rule 33, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." See Fed. R. Crim. P. 33(a). This discretion should be exercised "sparingly and in the most

31

extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." See United States v. Gramins, 939 F.3d 429, 444 (2d Cir. 2019). "[T]he 'ultimate test' for granting a new trial pursuant to [Rule 33] is 'whether letting a guilty verdict stand would be a *manifest injustice.*'" See Id. (quoting Untied States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).

### III.   LEGAL ARGUMENT

A court may grant a new trial based on newly discovered evidence "only upon a showing that (1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." See United States v. Forbes, 790 F.3d 403, 406-07 (2d Cir. 2015).

The Ms. Pecot/Ms. Crimmins evidence goes to central issues of credibility and *mens rea* that had been withheld and only discovered after Teman's sentencing that is reversible error. The new evidence is material and it raises genuine issues of guilt or innocence relating to Teman's *mens rea* and witnesses' knowledge of key contractual provisions in GateGuard's Terms and Conditions. The new evidence also raises substantial questions under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), as the new evidence is both exculpatory and relevant for impeachment purposes. Moreover, it is not

credible that the government was unaware of the relevant emails of its own witnesses, or if it was, it abdicated its basic duties to conduct a proper pre-trial investigation of the facts. See Cooper v. Graham, Case No. 10-cv-6467, 2011 U.S. Dist. LEXIS 132625, at 7 and Note 2 (W.D.N.Y. Nov. 17, 2011)(Failure to make appropriate inquiry runs afoul of defendants' due process rights).

The government presented Soon-Osberger as one of its key witnesses and could easily have obtained her relevant emails. Even if Pecot was unavailable for trial, her communications, as well as Ms. Hom's could readily have been obtained and reviewed by the government once it became clear from Soon-Osberger's emails that there was material correspondence with Pecot and Ms. Hom relevant to the government's core theory. The failure to obtain and produce such evidence comes within Brady. See Valentin v. City of Rochester, 2018 U.S. Dist. LEXIS 182601, at *3 (W.D.N.Y. Oct. 24, 2018), aff;d, 783 F. App'x 97 (2d Cir. 2019)(Prosecutor suppressed information within the meaning of Brady because such information was "readily available"); United States v. Quinn, 537 F. Supp. 2d 99, 110 (D.D.C. 2008)(Government cannot turn "a blind eye to the evidence" or make a "conscious decision that information need not be pursued further or disclosed" to defendant); United States v. Risha, 445 F.3d 298, 307 (3d Cir. 2006)(The Prosecutor may still be considered to have suppressed evidence if he has not sought out information readily available to him)(Nygaad J. dissenting);

United States v. Brooks, 966 F.2d 1500, 1504 (D.C. Cir. 1992)(U.S. Attorney's Office ordered to review files that may contain material exculpatory information); United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991)(Prosecutor cannot avoid finding out what "the government" knows simply by declining to make a reasonable inquiry of those in a position to have relevant knowledge); Kyles v. Whitley, 514 U.S. 419, 437 (1995)(A prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

Indeed, "the Government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense."  See United States v. Meregildo, 920 F. Supp. 2d 434, 438-39 (S.D.N.Y. 2013); United States v. Rodriguez, 496 F.3d 221, 225-26 (2d Cir. 2007)("This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions").  In Giglio, the Supreme Court explained that Brady "held that suppression of material evidence justifies a new trial irrespective of the goof faith or bad faith of the prosecution."  Courts have universally granted new trials where the Government violates Brady and/or Giglio.  See United States v. Andrews, 532 F.3d 900, 905 (D.C. Cir. 2008)("If the undisclosed evidence is material, a new trial is required"; Government of Virgin Islands v. Fahie, 419 F.3d 249, 252 (3d Cir.

34

2005)("the Court has assumed that *Brady* violations that have affected the judgment of a jury normally will be remedied by a new trial…"); United States v. Cuffie, 80 F.3d 514, 517 (D.C. Cir. 1996)("Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict").

Although information is not considered "suppressed" if the defendant could have discovered the evidence on his or her own, exercising due diligence. See Hughes v. Phillips, 457 F. Supp. 2d 343, 360 (S.D.N.Y. 2006), Soon-Osberger refused to comply with the defense subpoena and Pecot was out of the country at the time of the trial. (SA-106) The defense also did not know that Ms. Hom had been copied on material emails between the 18 Mercer Board Members.

For the foregoing reasons, Teman has a meritorious argument that new evidence discussed entitles him to a new trial. Any motion for a new trial grounded on newly discovered evidence must be filed within three (3) years after the verdict or finding of guilty. See Fed. R. Crim. P. 33(b)(1). Regardless of when Teman's motion is considered to have been made, it is timely.

In general, to vacate a conviction on the grounds of newly discovered evidence, the defendant must show that the evidence could not have with due diligence have been discovered before or during trial, that the evidence is material,

not cumulative and the admission of the evidence would probably lead to an acquittal.  See United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980).  Here, as discussed, Teman could not have discovered the Ms. Crimmins and Soon-Osberger emails because Soon-Osberger had failed to comply with her subpoena and Teman had no means of knowing how other Board members had interacted with Soon-Osberger.  The Ms. Crimmins emails are material because they show that Soon-Osberger and Ms. Hom, the government's only 18 Mercer witnesses were alerted that 18 Mercer was legally liable for device removal fees, which directly undercuts the government's core theory that GateGaurd's enforcement of its Terms and Conditions was a total "shock" to the witnesses who had no knowledge or recollection of the applicable provisions of the Terms and Conditions.  This evidence was clearly not merely cumulative as there was nothing similar that had been offered by either the prosecution or the defense during trial.

As a result, with respect to Counts II and IV, evidence that Soon-Osberger and Ms. Hom had been warned of legal liability under a 10-year contract for the device removal fee, not only by Teman, but by one of the 18 Mercer Board members would very probably have led to a determination that Teman not only actually believed he was entitled to issue RCCs to enforce the contractual provision, but also that he was contractually justified in doing so.  This would have

directly negated both Teman's mens rea and the core factual predicates for the government's case.

The test for Rule 33 motions often includes a requirement that the evidence be not "merely cumulative or impeaching." See United States v. Owen, 500 F.3d 83, 88 (2d Cir. 2007). This does not mean that newly discovered impeachment evidence can never justify a new trial, only that impeachment evidence cannot be "merely" impeaching. See United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)(No new trial where evidence merely furnishes "an additional basis" for impeachment of already questionably credible witnesses). Impeachment evidence would be material if the witness whose testimony is attacked "supplied the only evidence linking the defendant(s) to the crime." See United States v. Petrillo, 821 F.2d 85 (2d Cir. 1987). Soon-Osberger and Hom were the only witnesses who testified as to the nature of the GateGuard Terms and Conditions and the issuance of the GateGuard RCCs. Thus, "the likely impact on the witness[es]'s credibility [of the new evidence] would have undermined a critical element of the prosecution's case." See United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995). A witness who lies to the jury loses credibility with that jury. See Payne, 591 F.3d at 60 ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of

the evidence and the credibility of the witnesses"; United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015)(a Court must defer to "the jury's assessment of witness credibility"); Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112-13 (2d Cir. 2015)(it is the jury's role to determine whether a witness is credible and to decide what weight to give to that witness's testimony). In note also, the communication chain between 18 Mercer and Teman shows that Teman reminded 18 Mercer of the contract terms and that both Hom and Soon-Osberger were aware of the removal fees even though they denied knowledge at trial. SA-110-19.

As to newly discovered evidence of perjured testimony, the standard for granting a new trial under Rule 33 is less stringent than the general rule discussed above. The critical factor in assessing the impact of allegedly perjured testimony is whether the government knew or should have known of the perjury. As this Court has stated:

> Courts in the Second Circuit apply two different standards when determining whether to grant a new trial based on newly discovered evidence that a Government witness likely perjured himself: If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

See United States v. Walker, 289 F. Supp. 3d 560, 566 (S.D.N.Y. 2018).

Where, as here, "the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." See United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991); Sanders v. Sullivan, 863 F.2d 218, 225 (2d Cir. 1988)(question is whether the jury's verdict 'might' be altered). If the government knowingly permitted the introduction of false testimony, reversal is "virtually automatic." See United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975). Indeed, even if the Government did not knowingly permit the introduction of false testimony, "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted. See Id., at 246-47.

For the reasons discussed above, the government should have known that Ms. Hom's testimony that she knew nothing about a GateGuard contract and that she believed GateGuard was a mere intercom installer was false. Ms. Hom was copied on an email in which the GateGuard contract, an $18,000 device removal fee, and potential litigation with GateGuard over its Terms and Conditions were expressly discussed and in which a Board member pointedly demanded follow-up information – plainly not the type of situation a management company would have simply ignored or that the government would not have known about had it merely reviewed relevant emails to its own star witness. In this situation, there is a

39

reasonable likelihood the jury would have reached a different judgment as to Counts II and IV – those involving 18 Mercer – and that its judgment as to Counts I and III would have been affected: if a key government witness for 18 Mercer was lying, why should the jury credit the testimony of witnesses for GateGuard's other commercial counterparts?

Also, the newly discovered evidence of <u>Brady-Giglio</u> violations provide an independent basis for a new trial. "When the defendant, as in this case, asserts the newly discovered <u>Brady</u> evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was 'material.' <u>See</u> <u>Schledwitz v. United States</u>, 169 F.3d 1003, 1011 (6th Cir. 1999). The United States Supreme Court has elaborated on the meaning of "materiality" in this context:

> A defendant need not *demonstrate* that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>See</u> <u>Kyles</u>, 514 U.S. at 434-35.

Here, the undisclosed evidence on its face not only raises substantial questions as to the existence of Teman's *mens rea* in the context of a contract dispute, but also, it suggests the presence of additional relevant emails further

40

discussing the basis for contractual liability under GateGuard's Terms and Conditions. This would reasonably place the matter "in such a different light as to undermine confidence in the verdict" with respect to Counts II and IV, and likely, by "ricochet" with respect to Counts I and III.

To the extent the undisclosed evidence would undermine the credibility of Soon-Osberger and Hom, that too would affect confidence in the verdict. "*Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial." See United States v. Madori, 419 F.3d 159, 170 (2d Cir. 2005). Whether Teman defrauded 18 Mercer turned exclusively on Soon-Osberger's claimed ignorance of the relevant portions of the GateGuard Terms and Conditions and Hom's claimed ignorance of virtually everything about GateGuard and Teman.

The Ms. Crimmins emails also undermine the credibility of both Soon-Osberger and Hom on these points and are thus determinative on the question of guilt or innocence as to 18 Mercer, as, without their reliable testimony, there was no basis to convict. Because the jury instructions made it possible for the jury to convict on a given count based on a unanimous determination as to any one customer and because the absence of a special verdict form or special interrogatories (A-1298.1) made it impossible to know which particular customer

41

relationship underpinned the guilty determination, a lack of confidence in the 18 Mercer outcome undermines confidence in the jury's verdict in Counts II and IV as a whole, which included 18 Mercer and Coney Realty. Also, if the 18 Mercer witnesses were willing to lie, so too would have been other witnesses caught up in a potential litigation with GateGuard. Since Soon-Osberger and Hom were key witnesses in the Government's case in chief, the jury, if made aware of the foregoing, certainly 'might' have acquitted. See Stofsky, 527 F.2d at 246-47. Indeed, the jury would likely have rejected the prosecution's pleas to believe its witnesses testimony and would have acquitted.

Further, there are limits to the district court's discretion not to hold an evidentiary hearing, especially when Governmental misconduct is alleged. Here, Government misconduct has been alleged and an Evidentiary hearing is necessary to insure an adequate record upon which to base an enlightened ruling. See United States v. Disston, 582 F.2d 1108, 1110-12 (7th Cir. 1978).

## B. The Court Should Reverse the District Court's Ruling on Teman's Rule 33 Motion Regarding New Evidence As to Soleimani and in Not Holding a Hearing.

## I. FACTS

On January 6, 2022, Teman filed a motion for sanctions against the government for obstruction of justice indicating in part that the government knew Soleimani was violating his subpoena and hid it. (SA-120) Said motion provided that the

42

defense issued a subpoena to the government witness Soleimani of ABJ Properties on December 23, 2019 for documents and discussions related to GateGuard and its employees and officers. (SA-120) The motion for sanctions also stated that Soleimani replied with documents on January 15, 2020, at 5:43:14 p.m. and said motion attached the missing documents. (SA-120-43) Note, on January 25, 2023, the district court also denied Teman's motion for new trial under Rule 33 and the motion for new trial (SA-146) indicated that said motion adopted Teman's motion for sanctions (SA-120).

The motion for sanctions also indicates that after trial in this case, in civil discovery and after the civil discovery deadlines in order to preclude furnishing said discovery to Teman timely in the underlying case, Teman was presented with conversations and documents Soleimani had about Teman with MVI Systems, LLC. MVI Systems, LLC was a defendant in a civil case <u>GateGuard, Inc. v. MVI Systems, LLC</u>, Case No. 1:19-cv-02472. The discovery was not produced in this case. (SA-120) The motion also states in relevant part that these previously-withheld documents, which the government knew existed and made clear that:

> (1) Soleimani knew that his internet connection was to blame for GateGuard having been offline[4] (EXHIBITS J, N), because that same internet connection was causing issues with the replacement company's system which he discussed in a group chat where he also discussed Teman, US v Teman, and GateGuard meaning he was required to hand it to the

---

[4] Soleimani testified at trial that the GateGuard system did not work and that Teman would blame the internet connection. (<u>See</u> Appendix 4, pp. 171-74).

Defense (EXHIBIT N). Soleimani and AUSA Bhatia knowingly lied to the jury multiple times telling them GateGuard did not work when it was Soleimani's internet connection which was faulty.

(2) Soleimani had a history of not paying Intercom vendors, using the same excuses he used to avoid paying Teman's company, GateGuard, and in-fact was in debt to the replacement company by over $13,000 (EXHIBIT J) and had refused to pay for more than a year,

(3) Soleimani made proactive efforts to hide that he was knowingly breaching his exclusive agreement with GateGuard, meaning Soleimani was well-aware of the Terms and Conditions of GateGuard. Soleimani perjured on the stand in US v Teman regarding his knowledge of the GateGuard Terms.

(4) Soleimani discussed the arrest of Teman and US v Teman with defendants in multiple federal civil trials which had been filed based on GateGuard's Terms and Conditions (EXHIBITS B, F),

(5) Soleimani and his co-conspirators not only hid these communications and documents, but also made a proactive effort to avoid a paper-trail at times when discussing Teman, moving from WhatsApp chat to phone (EXHIBIT B),

(6) Soleimani aided MVI, defendants in a trade secret theft suit filed by GateGuard (Teman) in gaining-access to and stealing proprietary information from GateGuard devices in exchange for discounts and revenue-sharing[,] []

(7) Soleimani had a revenue sharing agreement with MVI and was listed as a Certified Distributor in violation of his exclusive agreement with GateGuard, and Soleimani knew this, and even asked MVI to hide his and their logos, but still made sure to get credit for business referrals to MVI -- that is, Soleimani was acting as a direct competitor to GateGuard together with MVI,

(8) Soleimani reviewed terms and contract length in detail before ordering an intercom (EXHIBIT H, "- It doesn't say anything about minimum terms, are there any? - what happens when they sell the property? These are q's Joe has."), and then failed to honor these written terms!

(9) Soleimani was willing to sign a contract for twice the amount per year for the knock-off service (MVI was $1300/year/building), and $3000+ for each device upfront. GateGuard's low monthly fee was because the cost was spread over 10-30 years, not because it was a cheap device! (Smart intercoms are low-volume, high-quality items which cost a lot to design, manufacture and support.)

(SA-120-43)

Furthermore, the motion for sanctions, indicates:

All of these, and other issues in the documents Soleimani hid would open him to cross examination, show he had a multi-million dollar incentive to have Teman falsely imprisoned, show he had a pattern of failing to pay vendors using the same excuses, show he and AUSA Bhatia falsely accused GateGuard of "not working" when he knew the cause was his internet connections and that he had far more issues with the replacement system. The jury would have seen Soleimani is a regular deadbeat who stiffed his intercom vendors and did not honor his agreements.

One of Soleimani's co-conspirators, Leon Goldenberg (Goldmont Properties) admitted in a sworn deposition that he'd hoped the criminal case would cause Teman to be unable to sustain a lawsuit filed against him! (EXHIBIT C)

(SA-121)

The motion further states:

The Government knew Soleimani was in communication with MVI and Goldmont. The Government knew these communications existed because of the suicide note Your Honor addressed before trial. The Government withheld the paper trail of the suicide note. They knew Soleimani gave them the note, and that he got it from Taub and Goldenberg, as the attached WhatsApp chats between Soleimani and Taub (EXHIBIT B) and Goldenberg and Litchfield (EXHIBIT A) show. The Prosecution should have produced the paper trail before trial and informed the Defense that Soleimani provided the note and that he got it from Taub and Goldenberg.

45

The Government knew that Soleimani was conspiring and colluding with two entities that GateGuard had sued over its online terms (the same online terms in question in US v Teman) and hid this. The Government hid at least one interview with Abi Goldenberg (Goldmont officer) and with Attorney Simcha Schonfeld, joint attorney for Goldenberg, Taub, and Soleimani. We also know from the Soleimani-Taub WhatsApp chat that Soleimani hid at least one discussion (with a defendant in a Federal civil trial filed by GateGuard!) of a NY State lawsuit where GateGuard was seeking to enforce its online terms. We learned of these hidden interviews and missing 3500 notes after trial. Therefore the Government was hiding documents on its own, and not speaking up when it became aware that Soleimani was non-responsive to his subpoena. The Government knew that the Goldenbergs were hoping to aid in putting Teman into prison to avoid paying a contract they signed worth nearly $100,000 more than the alleged damages in US v Teman, and that GateGuard's bank account was to be in the black long before trial -- had Goldenberg not breached their agreement. (EXHIBIT C). The Jury would have heard of a case with no damage to any bank.

(SA-121)

The motion also indicates that the government and its witnesses actively hid an abundance of exculpatory and impeachment evidence, including evidence Teman warned the clients very clearly in advance of the fees being drafted, and that the clients believed themselves to be "legally liable" for the fees. (SA-122-23) The motion also indicates that it is also clear from the hidden evidence that GateGuard's online terms were discussed frequently and extensively by Soleimani with members of his organization and others. (SA-122-23)

Further, the motion provides that contrary to Soleimani's testimony, and the false image presented by the government, the terms were not hidden, but were discussed openly by Teman with the clients and then by clients with multiple

46

parties in emails and messages they intentionally hid from the defense. The motion adds that the fundamental accusation of the case is completely false and that Teman was upfront with the clients about the terms and fees, and that Soleimani asked for and was denied "a release" from GateGuard's counsel. (SA-122-23)

Moreover, the motion asserts that Teman had just as much right to believe he was allowed to draft these fees, that BOA's shortage was avoidable several ways, which was learned of after the trial and unrelated to Teman's RCC's, including proper chargeback(s) handling by Signature Bank, proving to Chase a pattern of fraudulent non-payment by Soleimani to intercom providers, and proper communication and procedures by the banks. (SA-122-23) The motion also indicates that the jury would have seen Teman had no *mens rea* to defraud his bank or his clients, that the jury would have seen that Soleimani was a perjurer and fraudster who intentionally hid evidence and that the jury would have found at least reasonable doubt and Teman would have been acquitted. (SA-122-23)

## II.   STANDARD OF REVIEW

This Court reviews the denial of a Rule 33 motion for an abuse of discretion. See James, 172 F.3d at 107. The same standard of review applies to the district court's determination on whether to conduct a hearing on the motion. See DiTomasso, 932 F.3d at 70. When considering a motion under Rule 33, a district

court "may vacate any judgment and grant a new trial if the interest of justice so requires." <u>See</u> Fed. R. Crim. P. 33(a). This discretion should be exercised "sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." <u>See</u> <u>Gramins</u>, 939 F.3d at 444. "[T]he 'ultimate test' for granting a new trial pursuant to [Rule 33] is 'whether letting a guilty verdict stand would be a *manifest injustice.'"* <u>See</u> <u>Id.</u> (quoting <u>Ferguson</u>, 246 F.3d at 134).

### III.  <u>LEGAL ARGUMENT</u>

As noted within Point I(A) above, in general, to vacate a conviction on the grounds of newly discovered evidence, the defendant must show that the evidence could not have with due diligence have been discovered before or during trial, that the evidence is material, not cumulative and the admission of the evidence would probably lead to an acquittal. <u>See</u> <u>Alessi</u>, 638 F.2d at 479. Here, as discussed, Teman could not have discovered the new evidence related to Soleimani (SA-120-43) because Soleimani had not produced the documents until after the underlying trial. (SA-120-43)

The new evidence is material because it shows that Soleimani discussed Teman's arrest in the underlying matter with Abi Goldenberg of Goldmont Realty Corp. who GateGuard was suing in the Southern District of New York for trade secret theft months before Teman deposited the RCCs, in Case No.: 1:20-cv-

01609, that Goldenberg had given Teman's suicide note to Soleimani, that Soleimani hired MVI Systems LLC (or "MVI"), which GateGuard was suing in the Southern District of New York, in Case No.: 1:19-cv-02472. (SA-120-43)

Also, the new evidence between Soleimani and MVI was that Soleimani hired MVI, who was GateGuard's competitor, to replace GateGuard, that Soleimani reviewed the contract Terms with MVI when Soleimani had testified he did not review the GateGuard contract Terms, that Soleimani, like GateGuard, also owed MVI monies ($13,000) for over a year, which goes toward Soleimani's history of owing monies with the same excuses to vendors such as GateGuard and MVI, that it was indeed ABJ's internet connection to cause Gateguard and also MVI devices not to work, which was contrary to Soleimani's testimony. (SA-120-43) Further, the new evidence would show that Soleimani was in business and had a revenue sharing agreement with MVI, which would show that Soleimani stood to save over $5.4 million by ending the agreement between ABJ and GateGuard, but stood to profit in his role as a certified dealer with a five precent (5%) revenue sharing agreement with MVI  This is important because Teman's defense would have been able to cross-examine Soleimani about MVI and show his motivation to prosecute Teman due to financial incentives with MVI. (SA-173) Also, the record shows that the government did not inform Teman's defense that it

had interviewed MVI's counsel, Mr. Schonfeld, prior to the underlying trial. (SA-173-210)

During trial, evidence was admitted that Teman attributed alleged complaints by customers due to internet connectivity problems. (A-472, 573-74, 638-40) The foregoing new evidence shows that Soleimani indicated there were internet problems, which were caused by the landline internet and not the GateGuard device(s), which had also impacted MVI, LLC's internet service. (SA-120-43) This evidence was clearly not merely cumulative as there was nothing similar that had been offered by either the prosecution or the defense during trial.

As noted above, the test for Rule 33 motions often includes a requirement that the evidence be not "merely cumulative or impeaching." See Owen, 500 F.3d at 88. This does not mean that newly discovered impeachment evidence can never justify a new trial, only that impeachment evidence cannot be "merely" impeaching. See Wong, 78 F.3d at 79 (No new trial where evidence merely furnishes "an additional basis" for impeachment of already questionably credible witnesses). Impeachment evidence would be material if the witness whose testimony is attacked "supplied the only evidence linking the defendant(s) to the crime." See Petrillo, 821 F.2d at 85. Soleimani was the only witnesses who testified as to alleged misconduct by Teman to ABJ. Thus, "the likely impact on

50

the witness[es]'s credibility [of the new evidence] would have undermined a critical element of the prosecution's case." See Payne, 63 F.3d at 1210.

As to newly discovered evidence of perjured testimony, the standard for granting a new trial under Rule 33 is less stringent than the general rule discussed above. The critical factor in assessing the impact of[5] allegedly perjured testimony is whether the government knew or should have known of the perjury. As this Court has stated:

> Courts in the Second Circuit apply two different standards when determining whether to grant a new trial based on newly discovered evidence that a Government witness likely perjured himself: If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

See Walker, 289 F. Supp. 3d at 566.

In this situation, there is a reasonable likelihood the jury would have reached a different judgment as to Counts I and III. Also, the newly discovered evidence of Brady-Giglio violations provide an independent basis for a new trial. "When the defendant, as in this case, asserts the newly discovered Brady evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the

---

[5] It should be noted that the government had also not furnished accurate evidence of Soleimani's dealings with a housing tenant (Stanley Howell) that pertained to a credibility issue. (A-2032)

favorable evidence at issue was 'material.' See Schledwitz, 169 F.3d at 1011. The

United States Supreme Court has elaborated on the meaning of "materiality" in this

context:

> A defendant need not *demonstrate* that after discounting the inculpatory
> evidence in light of the undisclosed evidence, there would not have been
> enough left to convict. The possibility of an acquittal on a criminal charge
> does not imply an insufficient evidentiary basis to convict. One does not
> show a *Brady* violation by demonstrating that some of the inculpatory
> evidence should have been excluded, but by showing that the favorable
> evidence could reasonably be taken to put the whole case in such a different
> light as to undermine confidence in the verdict.

Kyles, 514 U.S. at 434-35.

Indeed, "the Government's obligations under *Brady* encompass not only

information that is admissible in its present form but also material information that

could potentially lead to admissible evidence favorable to the defense." See

Meregildo, 920 F. Supp. 2d at 438-39; United States, 496 F.3d at 225-26 ("This

obligation is designed to serve the objectives of both fairness and accuracy in

criminal prosecutions"). In Giglio, the Supreme Court explained that Brady "held

that suppression of material evidence justifies a new trial irrespective of the goof

faith or bad faith of the prosecution." Courts have universally granted new trials

where the Government violates Brady and/or Giglio. See Andrews, 532 F.3d at

905 ("If the undisclosed evidence is material, a new trial is required"; Fahie, 419

F.3d at 252 ("the Court has assumed that *Brady* violations that have affected the

judgment of a jury normally will be remedied by a new trial…"); Cuffie, 80 F.3d at

517 (D.C. Cir. 1996)("Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict").

Where, as here, "the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." See Wallach, 935 F.2d at 456; Sanders, 863 F.2d at 225 (question is whether the jury's verdict 'might' be altered). If the government knowingly permitted the introduction of false testimony, reversal is "virtually automatic." See Stofsky, 527 F.2d at 243. Indeed, even if the Government did not knowingly permit the introduction of false testimony, "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted. See Id., at 246-47.

Here, the undisclosed evidence on its face not only raises substantial questions as to the existence of Teman's *mens rea* in the context of a contract dispute, but also, it suggests the presence of additional relevant emails further discussing the basis for contractual liability under GateGuard's Terms and Conditions. This would reasonably place the matter "in such a different light as to undermine confidence in the verdict" with respect to Counts I and III.

To the extent the undisclosed evidence would undermine the credibility of Soleimani, that too would affect confidence in the verdict. "*Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial." See United States v. Madori, 419 F.3d at 170. Also, since Soleimani was a key witnesses in the Government's case in chief, the jury, if made aware of the foregoing, certainly 'might' have acquitted. See Stofsky, 527 F.2d at 246-47. Indeed, the jury would likely have rejected the prosecution's pleas to believe its Soleimani's testimony and would have acquitted.

Further, as noted above, there are limits to the district court's discretion not to hold an evidentiary hearing, especially when Governmental misconduct is alleged. Here, Government misconduct has been alleged and an Evidentiary hearing is necessary to insure an adequate record upon which to base an enlightened ruling. See Disston, 582 F.2d at 1110-12.

## CERTIFICATE OF COMPLIANCE

I, Thomas J. Butler, an attorney duly admitted to practice before this Court, hereby certify that the foregoing memorandum of law contains 12,829 words, in compliance and that this memorandum complies with the Court's applicable formatting rules. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum.

54

This brief complies with the word count limitations of Fed. R. App. P. 32(a)(7)(B)(ii), excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced 14-point Times New Roman typeface font using Microsoft Word.

Dated: October 21, 2024                      */s/*Thomas J. Butler
New York                                 Thomas J. Butler, Esq.

**SPECIAL APPENDIX**

## TABLE OF CONTENTS

                                                                                            **Page**

Order, dated July 29, 2021, Appealed From ..................................................... SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                -v-

ARI TEMAN,

                     Defendant.

19 Cr. 696 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

On October 6, 2023, the Court issued an opinion and order denying the application of

defendant Ari Teman to defer his October 10, 2023 surrender date. Dkt. 402. Insofar as that

application was based on Teman's pending *pro se* motions under Rule 33, the Court assessed the

merits of those motions at length. *See id.* at 4–16 (evaluating motions filed at Dkts. 386 and

388). The Court found the prospects of success of the Rule 33 motions, which were fully

briefed, "exceedingly low, so as to be, at best, asymptotic to zero." *Id.* at 5. But, because the

Rule 33 motions appeared likely to overlap in subject matter with the ineffective assistance of

counsel claim that Teman had stated he intended to bring under 28 U.S.C. § 2255, the Court did

not then definitively resolve the Rule 33 motions. *See id.* at 4–5.

This order definitively resolves—and denies—Teman's Rule 33 motions. The Court

does so now, because, more than three-and-a-half months later, Teman has not filed a § 2255

motion. Definitively resolving the Rule 33 motions now affords the parties' closure on these

motions. It will also permit Teman, for whom counsel has recently appeared on the docket of

this case, to appeal the Court's denial of these motions, should he deem it worthwhile to do so.

*See* Dkt. 410 (notice of appearance of Edoardo Maffia, Esq.).

For avoidance of doubt, the Court denies the Rule 33 motions on the merits, for the reasons set forth in its opinion and order of October 6, 2023, *see* Dkt. 402, as amplified by the substantially coextensive merits analysis by the Government in its opposition to those motions, *see generally* Dkt. 399. In denying the Rule 33 motions, the Court does not reach the separate argument raised by the Government, which the Court regards as substantial, as to whether the Rule 33 motions were untimely filed. The motions were filed in September 2023, more than three years after the jury's January 2020 verdict. *See* Fed. R. Crim. P. 33(b)(1) ("Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty."). Teman notes, however, than in 2022, he filed a *pro se* letter stating an intention to make a Rule 33 motion along substantially the same lines. *See* Dkt. 400 at 2 (citing Dkt. 303). In the event that the Court's denial of the Rule 33 motions on the merits were overturned, the Court would then take up the question of timeliness.

The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 303, 386, and 388. Although Teman is represented by counsel, the Court, out of an abundance of caution, directs the Clerk of Court to mail this order to Teman to ensure prompt receipt. Teman is reminded that he has 14 days to appeal this decision. *See* Fed. R. App. P. 4(b)(1)(A). Failure to timely appeal will result in dismissal of the appeal.

The Clerk of Court is requested to mail a copy of this order to the defendant at the address below:

Ari Teman (No. 18244-104)
FCI Miami
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 779800
MIAMI, FL 33177

SPA-3

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 25, 2024
      New York, New York