# 24-345

*To Be Argued By*:
Jacob H. Gutwillig

# United States Court of Appeals
## FOR THE SECOND CIRCUIT
## Docket No. 24-345

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ARI TEMAN, also known as Sealed Defendant 1,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR THE UNITED STATES OF AMERICA

Danielle R. Sassoon,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

Jacob H. Gutwillig,
Jacob R. Fiddelman,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Teman's Trial . . . . . . . . . . . . . . . . . . . . . . .  3

        1.  The Government's Case. . . . . . . . . . . . .  3

        2.  The Defense Case. . . . . . . . . . . . . . . . .  6

        3.  The Verdict. . . . . . . . . . . . . . . . . . . . . .  7

    B.  Teman's Post-Trial Motions, Sentencing, and Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . .  7

    C.  The Rule 33 Motions. . . . . . . . . . . . . . . . . . .  8

    D.  The District Court's Decision. . . . . . . . . . .  10

ARGUMENT:

The District Court Did Not Abuse Its Discretion in Denying Teman's Rule 33 Motions. . . . . . . . . .  14

    A.  Relevant Facts—Trial Evidence Regarding 18 Mercer. . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  17

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  19

        1.  Judge Engelmayer Did Not Abuse His Discretion in Rejecting Teman's Claims of New Evidence Relating to 18 Mercer . . . . . . . . . . . . . . . . . . . . . . .  19

ii

PAGE

2.  Teman's Claims of Purported New
    Evidence Relating to Soleimani and the
    ABJ Companies are Outside the Scope of
    this Appeal . . . . . . . . . . . . . . . . . . . . .  24

3.  Teman's Claims Regarding Soleimani
    and the ABJ Companies Are Meritless in
    Any Event . . . . . . . . . . . . . . . . . . . . . .  25

4.  Teman's Rule 33 Motions Were
    Untimely . . . . . . . . . . . . . . . . . . . . . . .  29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

## TABLE OF AUTHORITIES

*Cases*:

*Eberhart v. United States*,
    546 U.S. 12 (2005) . . . . . . . . . . . . . . . . . . . . . . . 29

*Johnson v. Perry*,
    859 F.3d 156 (2d Cir. 2017) . . . . . . . . . . . . . . . . 24

*PHL Variable Ins. Co. v. Town of Oyster Bay*,
    929 F.3d 79 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 24

*Puckett v. United States*,
    556 U.S. 129 (2009) . . . . . . . . . . . . . . . . . . . . . . 26

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 24

iii

PAGE

*United States v. Avellino,*
  136 F.3d 249 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 22

*United States v. Barcelo,*
  628 F. App'x 36 (2d Cir. 2015) . . . . . . . . . . . . . . 22

*United States v. Delva,*
  858 F.3d 135 (2d Cir. 2017) . . . . . . . . . . . . . . . . 28

*United States v. Esteras,*
  102 F.4th 98 (2d Cir. 2024) . . . . . . . . . . . . . . . . 28

*United States v. Ferguson,*
  246 F.3d 129 (2d Cir. 2001) . . . . . . . . . . . . . . . . 18

*United States v. Forbes,*
  790 F.3d 403 (2d Cir. 2015) . . . . . . . . . . . . . . . . 17

*United States v. Gambino,*
  59 F.3d 353 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 19

*United States v. Guang,*
  511 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . 18

*United States v. James,*
  712 F.3d 79 (2d Cir. 2013) . . . . . . . . 17, 18, 21, 23

*United States v. Marcus,*
  560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Parse,*
  789 F.3d 83 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 18

*United States v. Robinson,*
  430 F.3d 537 (2d Cir. 2005) . . . . . . . . . . . . . . . . 29

*United States v. Stewart,*
  433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . 18, 21, 22

iv

PAGE

*United States v. Villafuerte,*
  502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . 26

*United States v. Williams,*
  998 F.3d 538 (2d Cir. 2021) . . . . . . . . . . . . . . . 25

*United States v. Wong,*
  78 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 18

*United States v. Zagari,*
  111 F.3d 307 (2d Cir. 1997) . . . . . . . . . . . . . . . 18

*Statutes, Rules & Other Authorities*:

Fed. R. App. P. 3(c)(1)(B) . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim. P. 45(b) . . . . . . . . . . . . . . . . . . . . . . 29

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-345

————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ARI TEMAN, also known as Sealed Defendant 1,

*Defendant-Appellant.*

————————

## BRIEF FOR THE UNITED STATES OF AMERICA

————————

### Preliminary Statement

Ari Teman appeals from an order entered on January 25, 2024, by the Honorable Paul A. Engelmayer, United States District Judge for the Southern District of New York, denying Teman's motions for a new trial based on newly discovered evidence pursuant to Fed. R. Crim. P. 33.

Superseding Indictment S2 19 Cr. 696 (the "Indictment") was filed on January 3, 2020, in six counts. Counts One and Two charged Teman with bank fraud, in violation of 18 U.S.C. § 1344. Counts Three and Four charged Teman with wire fraud, in violation of 18 U.S.C. § 1343. Counts Five and Six charged Teman

2

with aggravated identity theft, in violation of 18 U.S.C. § 1028A. Before trial, the Government elected not to proceed on Counts Five and Six.

Trial commenced on January 22, 2020, and ended on January 29, 2020, when the jury returned a verdict of guilty on Counts One through Four.

On June 5, 2020, the District Court denied Teman's numerous post-trial motions under Fed. R. Crim. P. 29 and 33.

On July 28, 2021, Judge Engelmayer sentenced Teman to one year and one day of imprisonment, to be followed by three years' supervised release, and imposed $333,000 in forfeiture, $259,340.32 in restitution, and a $400 mandatory special assessment. Teman was released on bail pending appeal.

On June 8, 2023, this Court affirmed Teman's convictions.

On September 15 and 21, 2023. Teman filed two *pro se* motions pursuant to Rule 33, seeking a new trial on the basis of newly discovered evidence and seeking to adjourn Teman's date to surrender into custody pending resolution of the motions.

On October 6, 2023, the District Court issued an order denying Teman's application to defer his surrender date based on the District Court's assessment that the post-trial Rule 33 motions had little merit.

On January 25, 2024, the District Court issued an order denying Teman's Rule 33 motions principally for the reasons stated in its October 6, 2023, order.

3

Teman has completed his term of imprisonment and is serving his term of supervised release.

## Statement of Facts

### A. Teman's Trial

#### 1. The Government's Case

In 2019, Teman used corporate bank account information from customers of his business to create fraudulent checks drawn on the customers' accounts that he used to steal $330,000 from the customers without authorization. Teman unsuccessfully argued at trial that he had authorization to create those checks because, he claimed, his customers had agreed to terms and conditions that authorized him in advance to do so to pay amounts allegedly owed to his business.

Teman owned GateGuard, Inc., which sold intercom devices to apartment buildings. (A. 449-50, 557-58, 626-27).[1] Teman told customers, who included the

_____

[1]   "A." refers to the appendix on Teman's direct appeal, *United States v. Teman*, No. 21-1920, on which the Court granted Teman permission to rely; "Br." refers to Teman's brief for this appeal; "SA" and "SPA" refer to the supplemental appendix and special appendix, respectively, filed with that brief; "Add." refers to the addendum to this brief; "GX" refers to a government exhibit admitted at Teman's trial; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, quotations omit internal

4

owners and cooperative boards of apartment buildings in Manhattan and the Bronx, that the intercoms would let residents monitor who was entering and leaving buildings and speak with visitors who rang the doorbell. (A. 449-50, 557-58, 626-27). In 2017 and 2018, GateGuard's customers included, in relevant part, (1) 518 West 204 LLC ("West 204"); (2) 18 Mercer Equity Inc. ("18 Mercer"); and (3) two related companies managed by ABJ Properties LLC (the "ABJ Companies"), each of which had purchased intercoms for its property for a few hundred to a few thousand dollars each. (A. 456, 479, 562-63, 596, 631-33, 1777-85, 1788, 1831). The customers paid Teman's company with checks written from their corporate accounts. (A. 1680-84, 1699, 1725).

Teman's relationships with his clients deteriorated in late 2018 and 2019. (A. 472, 497, 651, 698). Tenants complained that the intercoms did not work properly, and the customers relayed those complaints to Teman. (A. 472, 573-74, 638-40). In response, Teman blamed internet connectivity problems or claimed that the customers or their tenants were not using the devices properly. (A. 574, 638). But the problems persisted, so the customers told Teman that they would stop using his intercoms or would look elsewhere when ordering devices for other buildings. (A. 470-71, 644, 1763, 1815). The clients' complaints and decisions to discontinue their business with GateGuard infuriated Teman, who responded with various accusations and

―――――――

quotation marks, citations, footnotes, and previous alterations.

5

insults; threats of legal action and the imposition of liens; threats to file complaints with law enforcement; and demands for exorbitant $18,000 "termination" fees for each intercom device that far exceeded the original cost of the intercoms. (*See, e.g.*, A. 575-77, 650, 698, 1763, 1820-21, 1829).

Representatives of each of the three customers at issue testified that they never authorized Teman or GateGuard to use their corporate bank account information to issue checks. (A. 464, 469, 565-66, 578, 700). Nor did Teman tell his clients at the time they entered contracts with GateGuard that he was assuming that authority. (A. 463-64, 469, 634-35, 705). The customer representatives each testified that they could never authorize a vendor to withdraw funds directly from their bank accounts because their companies needed to retain control over their corporate accounts' inflows and outflows. (A. 464-65, 498, 565, 706).

Once his relationships with his customers deteriorated, Teman created unauthorized checks drawn on his customers' bank accounts and deposited them into his own accounts. First, on March 28, 2019, Teman deposited two checks of $18,000 each—one drawn on West 204's account and one drawn on 18 Mercer's account—into GateGuard's account at Bank of America (the "March 2019 Checks"). (A. 1657.1). This deposit was the subject of the bank fraud and wire fraud offenses charged in Counts Two and Four, respectively. (A. 122-24). Second, on April 19, 2019, Teman deposited 27 checks worth a total of $297,000 drawn on the accounts of the ABJ Companies and West 204 (the "April 2019 Checks") into the GateGuard account.

6

(A. 409, 1657.1, 1730-56). With respect to all the checks, witnesses who managed the relevant customer bank accounts testified that the relevant entity had not authorized the checks. (A. 494-95, 497-98, 504, 578, 611, 700). After making the relevant deposits, Teman quickly transferred the deposited funds to other accounts he controlled. (A. 235, 1657.1). Ultimately, Bank of America (which was forced to repay various chargebacks) lost $260,000 as a result of Teman's fraudulent transactions. (A. 378, 1657.1).

## 2. The Defense Case

The defense called one witness at trial, Ariel Reinitz, an attorney for Teman and GateGuard. Teman attempted to persuade the jury that that the terms and conditions to which GateGuard's customers had agreed had included authorization for Teman write checks drawn on the customers' accounts to pay Gate-Guard in the event of a dispute or nonpayment. Through Reinitz, the defense introduced a section from GateGuard's website entitled "Payment Terms," which was a separate link from the "Terms and Conditions" to which customers had been directed when buying GateGuard products. (A. 924, 1880-86). Among other provisions, that "Payment Terms" page purportedly authorized Teman to "write and sign checks" drawn on the customers bank account for any amounts owed to GateGuard. (A. 1884). That page, however, listed January 27, 2019 as the date it was "last revised" (A. 1880) —*after* the relevant customers had purchased their intercom devices and seen their relationships with Teman deteriorate, and just before Teman began writing and depositing customer checks. The trial record

7

contained no evidence—whether documents or testimony—supporting the notion that this authorization language had been part of the customers' original agreement, rather than added by Teman after the fact as part of his fraud.

Reinitz testified on direct examination that he had advised Teman, after Teman proposed use of these "remotely created checks" or "RCCs" to collect amounts owed from customers, that they were a legitimate payment method. (A. 907-08, 911-12). But contemporaneous text messages between Teman and Reinitz introduced on cross-examination contradicted that testimony and established that Reinitz had instructed Teman *not* to use customer checks to pay himself because it would likely result in criminal charges. (A. 954, 958, 1872-79).

### 3. The Verdict

On January 29, 2020, the jury returned a verdict finding Teman guilty on Counts One through Four. (SA 20).

### B. Teman's Post-Trial Motions, Sentencing, and Direct Appeal

After trial, Teman moved for a judgment of acquittal or, alternatively, a new trial, pursuant to Rules 29 and 33, raising a variety of arguments not relevant to this appeal. (A. 1437-72). On June 5, 2020, Judge Engelmayer denied Teman's post-trial motions in a thorough and detailed opinion. (A. 1937-2043).

On July 28, 2021, Judge Engelmayer sentenced Teman to one year and one day of imprisonment, to be

8

followed by three years' supervised release, and imposed $333,000 in forfeiture, $259,340.32 in restitution, and a $400 mandatory special assessment. (A. 2428-29). Teman appealed his conviction.

During the pendency of Teman's appeal, Teman filed various *pro se* letters with the District Court raising a variety of issues and complaints. (*See, e.g.*, Dkt. 265, 301, 303). One such letter sought sanctions against the Government (but no other relief) for allegedly withholding what Teman alleged was defense-favorable evidence regarding Government trial witness Joseph Soleimani, who had testified about the ABJ Companies being defrauded by Teman. (SA 120-23). Teman later indicated that, at some future time, he would file a Rule 33 motion based on those allegations, among others. (SA 146-47). On February 18, 2022, Judge Engelmayer issued an order in which he observed that the District Court lacked jurisdiction due to the pending direct appeal and declined to address Teman's various *pro se* letters for that reason. (SA 148-49).

On June 8, 2023, this Court affirmed Teman's conviction by summary order. *See United States v. Teman*, No. 21-1920, 2023 WL 3882974 (2d Cir. June 8, 2023). The mandate issued on August 18, 2023, returning jurisdiction to the District Court. (Dkt. 380).

## C. The Rule 33 Motions

After conclusion of Teman's direct appeal, the District Court ordered Teman to surrender to the Bureau of Prisons for service of his sentence by October 10,

9

2023.[2] (Dkt. 377). Shortly before his surrender date, Teman filed two *pro se* motions, both of which were filed more than three years after the jury's January 2020 verdict. First, on September 15, 2023, Teman filed a Rule 33 motion claiming that an August 2021 letter to the District Court from Shelly J. Pecot, a shareholder of 18 Mercer, and internal 18 Mercer emails furnished to Teman by Pecot, undermined the trial testimony of 18 Mercer's representatives Bonnie Soon-Osberger and Gina Hom that 18 Mercer had not authorized Teman to create and deposit the $18,000 check on 18 Mercer's account that he deposited on March 28, 2019. (SA 150-58, the "September 15 Motion").

Second, on September 21, 2023, Teman filed a Rule 33 motion claiming that his sentencing and appellate counsel had colluded with the Government to withhold the purportedly exculpatory evidence relating to 18 Mercer that was referenced in the September 15 Motion. (SA 173-87, the "September 21 Motion"). Neither of the Rule 33 Motions was premised on allegedly withheld evidence regarding Soleimani and the ABJ Companies.

Teman separately moved to adjourn his upcoming surrender date until the District Court ruled on the Rule 33 Motions. (Dkt. 394). On October 6, 2023, the District Court denied that request, carefully

―――――――――

[2] The District Court had previously granted Teman bail pending appeal for reasons not implicated in this appeal. (A. 2443-52).

10

evaluating the merits of the Rule 33 Motions and concluding that the likelihood that the District Court would ultimately grant relief was "exceedingly low, so as to be, at best, asymptotic to zero." (Add. 4-5; *see* Add. 1-17).[3]

## D.  The District Court's Decision

On January 25, 2024, Judge Engelmayer formally denied the Rule 33 Motions for the reasons set forth in his October 6, 2023, opinion denying an extension of Teman's surrender date, "as amplified by the substantially coextensive merits analysis by the Government in its opposition to those motions." (SA 266-68 (incorporating Add. 1-17 and SA 229-38 by reference)).

The District Court concluded that there were three independent reasons why the "'new evidence' Teman musters relating to 18 Mercer does not come close to meeting Rule 33's standards." (Add. 5).

First, Judge Engelmayer concluded that the purported "new evidence" was neither exculpatory nor new, and in any event related to "[o]nly one check among the 29 on which Teman's fraud convictions were based"—the check drawn on 18 Mercer. (Add. 7).

–––––––––––

[3]   The District Court deferred formal decision on the Rule 33 Motions pending Teman's anticipated collateral attack on his conviction pursuant to 28 U.S.C. § 2255 to assess the matters together, (Add. 3-4), but later denied the Rule 33 Motions as described below when no Section 2255 motion had been filed after several more months.

11

Even as to that single check, Judge Engelmayer found that the purportedly new evidence "does not undermine the overwhelming trial evidence that 18 Mercer . . . had not authorized [Teman] to draw or negotiate that check on its account." (Add. 7). The District Court detailed extensive trial testimony—from Soon-Osberger, 18 Mercer's treasurer, and Hom, the vice president of its management company—supporting that conclusion. Judge Engelmayer ultimately concluded that "[t]he purported 'new evidence' to which Teman points does not, in the least, undermine Soon-Osberger's or Hom's central testimony: that 18 Mercer *never* authorized Teman to draw the $18,000 check on its account." (Add. 10). That was because, Judge Engelmayer observed, the purportedly "new evidence" Teman had submitted—a letter from Pecot, one of the 18 Mercer board members—allegedly demonstrating that Teman mentioned an $18,000 removal fee and the right to withdraw owed funds from 18 Mercer's bank account "does not situate Teman's statements . . . in time" and, therefore, did not support an assertion that he had made such statements "at the time 18 Mercer entered into its agreement with GateGuard to purchase the $2,499 intercom, let alone that 18 Mercer ever agreed to such improbable terms." (Add. 10). Indeed, Pecot disclaimed in her letter having had any firsthand personal knowledge of the process by which Teman and 18 Mercer entered the agreement. (Add. 10). Nor did she identify any writing or other interaction in which 18 Mercer's board agreed to Teman's claimed authority to draw checks on the cooperative's bank accounts. (Add. 10).

12

The District Court also concluded that the emails Pecot provided in which Teman indicates he might draw an $18,000 check from 18 Mercer were fully consistent with the trial testimony offered by the Government, because they began in late 2018, *after* Teman began threatening retaliation after the relationship fell apart. (Add. 10-11). Indeed, a similar email containing such a threat had been admitted as a Government exhibit at trial, rendering the evidence Teman submitted merely cumulative and not "new." (Add. 11 (citing GX 443)). Judge Engelmayer concluded that the reference to "legal liability" in one of the internal 18 Mercer emails Teman had submitted was not, in fact, a recognition of the legality of Teman's position but, rather, was merely a warning to other shareholders to steer clear of Teman given that Teman was threatening legal action. (Add. 12).

Second, Judge Engelmayer concluded that Teman's purported "new evidence" did not support his trial theory of defense. (Add. 12-15). Judge Engelmayer explained that Teman's defense at trial "was based upon the fact that his company's contractual terms and conditions stated that they were subject to additional 'Payment Terms' and identified a URL." (Add. 13). But Teman "failed at trial to adduce any evidence supporting the premise of this line of defense," (Add. 13), because "there was no competent evidence at trial that the relevant aspects of the Payment Terms had been in place at the times any of the Customers contracted with Teman." (Add. 14). The District Court concluded that Teman had been in the best position to come forward with any such evidence if it existed, but had

13

failed to do so in the 44 months since trial or in the Rule 33 Motions. (Add. 14).

Third, even if Teman's purported "new" evidence called into question whether 18 Mercer's board had authorized Teman to draw the March 28, 2019 check for $18,000 on its account—and it did not—the District Court noted that "those materials have no bearing on whether Teman had authorization to draw the remaining 28 checks that he negotiated to enrich himself." (Add. 15). The District Court therefore concluded that a new trial was not warranted in any event, because the so-called "new evidence" would not have impacted the vast majority of the evidence, which would have remained overwhelmingly supportive of all four counts of conviction.

Ultimately, Judge Engelmayer concluded that "it is not a manifest injustice to let the jury's guilty verdict stand. Far from it: that verdict was supported by overwhelming evidence. And the ostensible 'new evidence' on which Teman relies does not, at all, call that verdict into question." (Add. 16). The District Court did not reach the separate argument, raised by the Government (*see* SA 232-33), that the Rule 33 Motions were untimely because they were filed more than three years after the verdict. Judge Engelmayer noted that it regarded the timeliness issue as "substantial" and would address the timeliness issue only if necessary on remand. (SA 267).

On February 7, 2024, Teman's counsel filed a notice of appeal that identified only the District Court's January 25, 2024 denial of the Rule 33 Motions as the order appealed from. (SA 269).

14

# A R G U M E N T

## The District Court Did Not Abuse Its Discretion in Denying Teman's Rule 33 Motions

Teman argues that he is entitled to a new trial because of purported "new evidence" supporting his innocence. (Br. 24-42). Teman is wrong. Judge Engelmayer reasonably concluded that the evidence Teman submitted about 18 Mercer was not new, not exculpatory, cumulative, and not material to the verdict. And Teman's arguments about new evidence regarding Soleimani and the ABJ Companies (Br. 42-54) were not raised in his Rule 33 Motions in the District Court and therefore fall outside the scope of this appeal.

### A. Relevant Facts—Trial Evidence Regarding 18 Mercer

At trial, 18 Mercer's representative Soon-Osberger testified that, from approximately October 2017 to January 2019, she was on the board of directors of the cooperative at 18 Mercer Street. (A. 553). In her capacity as a board member, Soon-Osberger was responsible for "[m]aintaining the expenditures, the budgets, and mak[ing] sure that all expenditures [did not] exceed our budget." (*Id.*). She also managed projects, including looking for vendors and obtaining bids that then were submitted to the board for approval. (*Id.*). Soon-Osberger also testified that 18 Mercer had a management company, Crystal Real Estate Management, that was responsible for paying 18 Mercer's bills, including issuing checks to pay invoices. (A. 554-55).

15

In approximately October 2017, Soon-Osberger met Teman at a convention, where she was searching for an intercom system to purchase for 18 Mercer Street. (A. 557-58). Teman gave her a demonstration of the GateGuard system and told her that the panel cost approximately $2,500, but did not mention anything about a cancellation fee or device removal fee. (*Id.*). Following the convention, Soon-Osberger communicated with Teman about purchasing a GateGuard unit, and in particular about the price for doing so. Soon-Osberger asked Teman for the specific amount "because when we do bidding, I have to have the exact amount. So I asked him to send me the pricing." (A. 564). Thereafter, Teman provided an invoice, dated March 26, 2018, which itemized $2,499 for the intercom system, $849 for installation, and $49.99 for a monitoring plan, totaling $3,947. (A. 1831; GX 431). The invoice included, in the bottom left-hand corner, text that read, "Buyer accepts terms & conditions at https://gateguard.xyz." (*Id.*). Soon-Osberger did not click on that link, see an agreement that referenced a thirty-year contract, or see anything that allowed Teman to write a check on behalf of 18 Mercer. (A. 565). Soon-Osberger confirmed that she "would not [have] agreed to" such terms because it was "not a practice that our co-op would abide by. We wouldn't do that. The only people that can write checks is our management, approved by the board. All the invoices are submitted, approved, and then handed over to the management to write the check." (*Id.*).

After receiving the invoice, on or about March 29, 2018, Soon-Osberger emailed Teman a series of questions about the "Terms & Conditions," including about

16

a provision allowing an increase on "monthly fees at a rate of up to 100% per year" and one granting Gate-Guard broad permission to install its equipment. (A. 1856; GX 442). In response, Teman reassured Soon-Osberger that certain of those provisions would not be applicable to 18 Mercer; in particular, he assured her that the provision relating to whether the intercom was being licensed to 18 Mercer or sold outright was a "tax loophole" and that he could "waive this if it's an issue for your board." (*Id.*). Soon-Osberger forwarded the invoice and an email summary to Hom, (A. 1831; GX 431, who issued a check to GateGuard, dated April 4, 2018, in the amount of $3,947.88, (A. 610; GX 143).

Shortly after Teman's intercom system was installed at 18 Mercer Street, Soon-Osberger and others began having concerns about the device. (A. 573-74). Soon-Osberger relayed those concerns to Teman and, ultimately, after trying various solutions suggested by Teman, members of the board of 18 Mercer determined it was necessary to remove the GateGuard system. (A. 574). Soon-Osberger conveyed this to Teman by email, mentioning to Teman that "it's not working; the system, we plug it in, it's not working," and that they had "tried the IP addresses [Teman] was asking, just multiple requests he had related to our services and each time it just didn't work." (A. 575). At that point, Soon-Osberger "said we need to move on, we do need to have the system removed." (*Id.*). Teman responded by "sending an email that we would be charged" and that "he would put a lien on the building." (A. 575). Soon-Osberger was "shocked" to receive an email from Teman, dated January 7, 2019, stating that "you are

17

not allowed to touch or move our device and there's an $18,000 fine for removing it." (A. 576; GX 443). Soon-Osberger also recalled another email in which Teman threatened to place a lien on 18 Mercer Street. (A. 577).

On March 28, 2019, Teman deposited into Gate-Guard's bank account an $18,000 check appearing to be written on behalf of "18 MERCER EQUITY INC c/o Crystal Real Estate Management." (A. 1729; GX 202). Hom—who was responsible for issuing checks to pay invoices for 18 Mercer—testified that she did not authorize this check and was "shocked" when she learned about it, and the check overdrew 18 Mercer's account. (A. 611-13).

## B. Applicable Law

Rule 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Where a motion for a new trial is based on a claim of newly discovered evidence, *see* Fed. R. Crim. P. 33(b)(1), the defendant bears a particularly high burden, for relief may only be granted upon a showing that (1) the evidence is newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013); *see also United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015). "Evidence is not new if the defendant knew of it prior

18

to trial, and is not considered 'newly discovered' if, with the exercise of reasonable diligence, it could have been discovered before or during the trial." *United States v. Parse*, 789 F.3d 83, 109 (2d Cir. 2015); *see United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997). A motion for a new trial based on newly discovered evidence "must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1).

This Court has recognized that a district court's discretion in evaluating a Rule 33 motion "is broad because its vantage point as to the determinative factor —whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006). Given the deference owed to a jury's verdict, this Court has cautioned that district courts should exercise their Rule 33 authority only "sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). In other words, a new trial motion "is ordinarily not favored" and "should be granted only with great caution." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996); *see Stewart*, 433 F.3d at 296 (recognizing that new trial motions should be granted only "in the most extraordinary circumstances"). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007).

This Court reviews a district court's decision denying a motion for a new trial for abuse of discretion. *See James*, 712 F.3d at 107; *Stewart*, 433 F.3d at 295. This Court particularly defers to a district court's judgment

19

regarding a Rule 33 motion based on allegedly newly discovered evidence, because, "having presided over the trial, [the district court] is in a better position to decide what effect the newly discovered materials might have had on the jury." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

## C. Discussion

### 1. Judge Engelmayer Did Not Abuse His Discretion in Rejecting Teman's Claims of New Evidence Relating to 18 Mercer

Judge Engelmayer did not abuse his considerable discretion in concluding that the so-called "new evidence" regarding 18 Mercer was neither new, exculpatory, nor material.

The premise of Teman's Rule 33 Motions was that the so-called new evidence supported his trial defense: that 18 Mercer did, in fact, know that the "Terms and Conditions" for purchasing the GateGuard intercom system included an $18,000 charge for tampering or removing a device and authorized Teman to write checks to himself from 18 Mercer's bank account to pay such a charge. (*See, e.g.*, Br. 32-33). For the reasons stated by Judge Engelmayer, however, the materials Teman submitted—a letter from board member Pecot and internal 18 Mercer communications—do not support Teman's defense at all.

Rather, as Judge Engelmayer observed, the communications all arose *after* the relationship between Teman and 18 Mercer broke down, once Teman began threatening various fees and legal action. (Add. 6-12).

20

Accordingly, Judge Engelmayer correctly concluded that the materials merely reflected Teman's after-the-fact assertions that he was entitled to those things, rather than evidence that 18 Mercer had knowingly agreed to them at the time it contracted with Gate-Guard. (Add. 10-11). Judge Engelmayer's conclusions were firmly grounded in the record. The emails reflect only that 18 Mercer *eventually* learned of Teman's claim that he was entitled to an $18,000 removal fee and to write checks to himself to pay it, which the trial evidence had already established. The trial record showed that 18 Mercer learned of this claim in approximately late 2018, when Teman threatened it with legal liability after 18 Mercer informed Teman that it would be removing the GateGuard system. (A. 575-77). As Soon-Osberger testified at trial, she thought 18 Mercer was purchasing an intercom unit for less than $4,000—indeed, one of the features that attracted her to GateGuard's system was the relatively lower price (*see* A. 582-83)—and Teman made assurances about certain contractual terms. As the District Court summarized, Hom too "emphatically denied that 18 Mercer's board had authorized payment" of the $18,000 check Teman drew on the account. (Add. 8-9; *see also* A. 611-13). Based on its careful review of Soon-Osberger's and Hom's trial testimony, the District Court correctly concluded that "[t]he purported 'new evidence' to which Teman points does not, in the least, undermine Soon-Osberger's or Hom's central testimony: that 18 Mercer *never* authorized Teman to draw the $18,000 check on its account." (Add. 10). Rather, the new evidence is entirely consistent with Soon-Osberger's and Hom's trial testimony. (Add. 10-11). For

21

the same reasons, the new evidence does nothing to raise any concern that Government trial witnesses lied on the stand, as the District Court concluded. *See Stewart*, 433 F.3d at 296 (observing that district court is in best position to assess effect of new evidence given its "vantage point" having presided over trial).

Judge Engelmayer also correctly observed that similar communications had been introduced at trial from that same time period, rendering the evidence cumulative. (Add. 11-12 & n.5). For the reasons stated in the District Court's thorough analysis, that observation reasonably led to Judge Engelmayer's additional conclusions that the new evidence was not new or material. *See James*, 712 F.3d at 107 (new evidence must be "newly discovered," "material," and "not merely cumulative," and must "likely result in an acquittal").

On appeal, Teman also argues that, at a minimum, his new evidence undermines Soon-Osberger's and Hom's credibility, and "that too would affect confidence in the verdict." (Br. 41). But marginal additional impeachment evidence is not sufficient to justify a new trial. *See James*, 712 F.3d at 107 (Rule 33 movant must establish that new evidence "is not merely cumulative or impeaching"). And, in any event, Judge Engelmayer did not abuse his discretion in concluding that the evidence was immaterial even when viewed as potential impeachment material, because of the "compelling circumstantial evidence corroborating that Teman had knowingly acted without authority in making and negotiating the 18 Mercer check (and the 28 checks he drew on the accounts of 518 West 204 and ABJ) and had dissembled in representing to the banks

22

that he had such authorization." (Add. 9). That evidence included, among other things, Teman's contemporaneous communications with his attorney, Reinitz, who advised that if Teman continued his course of action he would likely be criminally charged; as well as the commonsense notion that terms involving an $18,000 removal fee and unlimited ability to charge customers through writing checks were highly implausible. (*Id.*; *see also* A. 1944-47 (summarizing evidence of Teman's fraudulent intent in denying his post-trial motions made pursuant to Rules 29 and 33)).[4]

In any event, regardless of whether Teman's purported new evidence would impact the jury's analysis of the one fraudulent check relating to 18 Mercer, that check was only one of 29 such fraudulent checks that the trial evidence conclusively established Teman deposited. Judge Engelmayer therefore reasonably

---

[4] To the extent Teman's argument on appeal can be read to imply that the Government violated its disclosure obligations by failing to turn over the 18 Mercer emails, (*see, e.g.*, Br. 33-35), Teman entirely fails to establish that the emails were ever in the possession of the prosecution team—a necessary component for any disclosure violation. *See, e.g.*, *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015); *Stewart*, 433 F.3d at 298; *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). And, in any event, for the reasons stated above, the emails are neither exculpatory nor material.

23

concluded that the purported new evidence would have had no material impact on the jury's findings regarding the vast majority of Teman's fraudulent conduct and therefore would not "likely result in an acquittal," *James*, 712 F.3d at 107; (*see* Add. 15). As Judge Engelmayer noted, the single $18,000 check relating to 18 Mercer, on which Teman's claims center, relates only to Counts Two and Four of the Indictment. (Add. 15). Counts One and Three, which charged Teman with bank fraud and wire fraud, were based on the April 2019 Checks, none of which were drawn on 18 Mercer's account. Judge Engelmayer reasonably concluded that, "[b]ecause none of those 27 checks was drawn on 18 Mercer's account, any new evidence relating to 18 Mercer could not disturb Teman's convictions on those two counts. And because the Court imposed the same concurrent sentence on all four counts, Counts One and Three independently support Teman's prison sentence." (Add. 15). There was no abuse of discretion in Judge Engelmayer's denial of the Rule 33 Motions.

### 2. Teman's Claims of Purported New Evidence Relating to Soleimani and the ABJ Companies are Outside the Scope of this Appeal

On appeal, Teman also argues that the District Court erred in denying the Rule 33 Motions based on purported new evidence regarding the credibility of Soleimani, the Government trial witness who testified about the ABJ Companies (another of Teman's fraud victims). (Br. 42-54).

24

But that evidence was never part of Teman's Rule 33 Motions; Teman did not seek a new trial based on that evidence, and the District Court did not address it in the decision challenged on this appeal. Rather, the Rule 33 Motions were based exclusively on the evidence regarding 18 Mercer discussed above. (*See* SA 150-58, 173-87). Instead, the allegations regarding Soleimani were raised in a January 6, 2022 letter seeking sanctions on the Government for purported misconduct, (SA 120-23), which the District Court declined to consider in favor of waiting for a single, formal Rule 33 motion once jurisdiction was returned to the District Court after conclusion of Teman's direct appeal. (SA 148-49). During the period when the District Court lacked jurisdiction, Teman indicated that he would file a Rule 33 motion based on these allegations at a future time, (SA 146-47), but he never did so.

In such circumstances, this Court should decline to consider these claims for the first time on appeal. They were never presented to the District Court in the context of a request for a new trial and do not fall within the scope of Teman's notice of appeal. *See* Fed. R. App. P. 3(c)(1)(B); *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 87 (2d Cir. 2019) ("We generally lack jurisdiction to review a decision that was not mentioned in the notice of appeal."); *Johnson v. Perry*, 859 F.3d 156, 167 (2d Cir. 2017) ("[T]he contents of the notice of appeal define the scope of the appellate court's jurisdiction."); *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256 (2d Cir. 1995) ("[A]ppellant's failure to mention the August 1 order in his notice of appeal bars us from considering his claim" with respect to that order). Teman's notice of appeal identifies only the District

25

Court's January 25, 2024 opinion and order, which denied Teman's September 15 Motion and September 21 Motion. (SA 269). The only District Court decision addressing Teman's January 6, 2022 letter raising the Soleimani-related claims is the District Court's January 2022 decision declining to address those claims due to its lack of jurisdiction, (SA 148-49), and that decision is not listed in Teman's notice of appeal. If Teman had wished to seek a new trial based on these claims, he easily could have raised them in his Rule 33 Motions, but he elected not to do so.

### 3. Teman's Claims Regarding Soleimani and the ABJ Companies Are Meritless in Any Event

Even if this Court were to consider in the first instance Teman's claims regarding Soleimani and the ABJ Companies, it should reject them.

As a threshold matter, because these arguments were not raised in the Rule 33 Motions, this Court should review only for whether Judge Engelmayer's failure to *sua sponte* reach several years back on the docket to identify these claims in the January 2022 sanctions letter, construe the Rule 33 Motions as reasserting those claims, and then grant the motions on that basis constituted plain error. Where a defendant did not raise in the District Court a claim of error he later makes on appeal, this Court will review that claim for plain error only. *See, e.g.*, *United States v. Williams*, 998 F.3d 538, 540 (2d Cir. 2021). To establish plain error, a defendant bears the burden of demonstrating that "(1) there is an error; (2) the error

26

is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "Meeting all four prongs [of the plain error standard] is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Judge Engelmayer did not err, much less plainly err, in not granting Teman a new trial based on his 2022 allegations seeking sanctions against the Government. Teman argues, in essence, that Soleimani did not provide certain documents in response to a defense subpoena issued in connection with trial, which would have been "exculpatory and impeachment evidence" and showed that Teman, contrary to the expansive record of this case, "warned very clearly in advance of the fees being drafted . . . and that the clients believed themselves to be 'legally liable for the fees.'" (Br. 46). The claim rests on various communications with Soleimani cited and summarized by Teman, and characterized by him to claim, among other things, that "Soleimani knew that his internet connection was to blame for GateGuard having been offline," that "Soleimani had a history of not paying Intercom vendors," that Soleimani discussed Teman's arrest with others in the context of civil litigation, and that "Soleimani

27

was well-aware of the Terms and Conditions of Gate-Guard." (Br. 43-44).

But the record belies these assertions. At trial, Soleimani testified, like the 18 Mercer witnesses, that he had "never signed any kind of terms," and that testimony was corroborated by contemporaneous messages between Soleimani and Teman. (*See* A. 643; GX 409C). That corroboration defeats Teman's claim that Soleimani was testifying falsely. Teman similarly argues that the "new" documents show that "Soleimani knew that his internet connection was to blame for Gate-Guard having been offline." (Br. 43). However, in an email from Soleimani to Teman dated well before trial —sent on or about November 6, 2017—Soleimani catalogues numerous issues with Teman's GateGuard devices, well beyond internet connectivity. (GX 402). And, in any event, whether internet connectivity issues were to blame for the ABJ Companies' GateGuard devices not working is entirely immaterial; the issue at trial was whether Teman fraudulently withdrew money from his clients' accounts without authorization. The trial evidence established that Teman's customers, including Soleimani and the ABJ Companies, had not been aware of the fees for device removal, attorney use, or chargebacks which they purportedly owed. (A. 1946-47 & n.12). As Judge Engelmayer noted in denying Teman's many post-trial motions, in May 2018, Teman emailed Soleimani, claiming that the ABJ Companies owed him for, among other things, device removal fees. When Soleimani responded, "[c]an you please send me the invoices which you are claiming we owe you? Not sure why we owe you money buy I'm glad to look into it," (GX 405), Teman responded

28

with an astonishing invoice that claimed that the ABJ Companies owed GateGuard more than $1.13 million, (GX 409). In short, the trial evidence—including contemporaneous communications corroborating Soleimani's testimony on crucial points—stands in stark contrast to Teman's meritless claims of malfeasance by Soleimani and the Government. And, even if these communications were "new," they do not establish that Soleimani testified falsely, nor do they support Teman's trial defense. Finally, Teman has not even attempted to argue that these materials were in the Government's possession before trial, (*see supra* n.4). In short, Judge Engelmayer's failure to *sua sponte* reach back and consider these prior arguments in the context of the Rule 33 Motions was not an error "so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to" raise the issue. *United States v. Esteras*, 102 F.4th 98, 108 (2d Cir. 2024).

### 4.  Teman's Rule 33 Motions Were Untimely

This Court can also affirm on the alternative basis that Teman's Rule 33 Motions were untimely. *See United States v. Delva*, 858 F.3d 135, 152 (2d Cir. 2017) (this Court is "free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied.").

Rule 33 motions based on newly discovered evidence must be filed within three years of the jury's guilty verdict. *See* Fed. R. Crim. P. 33(b)(1). Although Rule 33's time limit is an "inflexible claim-processing rule," it is not "jurisdictional" and is therefore subject

29

to the time-modification provisions of Fed. R. Crim. P. 45(b). *Eberhart v. United States*, 546 U.S. 12, 13 (2005); *United States v. Robinson*, 430 F.3d 537, 541 (2d Cir. 2005). Rule 45(b), in turn, permits a district court to extend a deadline for "good cause" and, if the request for an extension is made after the deadline, only if the movant also demonstrates that "the party failed to act because of excusable neglect."

In this case, the jury's verdict was returned on January 29, 2020. (SA 20). Nevertheless, despite stating an intention within that three-year window to file a Rule 33 motion based on communications from Pecot received after trial, Teman did not do so until more than three years after the verdict. When he finally did so, he made no attempt to explain why "good cause" existed for a retroactive extension of time or why his failure to timely file resulted from "excusable neglect." Thus, even if the three-year time limit set forth in Rule 33(b)(1) applies to the motions, they were not timely filed despite Teman being aware of the evidence in question since at least 2022. (SA 146-47). And, for the reasons stated above, Judge Engelmayer's conclusion that the 18 Mercer evidence was not "new" within the meaning of Rule 33(b)(1) also means that any motion for a new trial based thereon must have been filed within 14 days of the jury's verdict. *See* Fed. R. Crim. P. 33(b)(2).[5]

---

[5]  At most, if this Court is inclined to conclude that Teman may be entitled to a new trial on the merits, this Court should remand for Judge Engelmayer to address the timeliness question in the first instance. (*See*

30

## CONCLUSION

**The order of the District Court should be affirmed.**

Dated:     New York, New York
           January 22, 2025

                    Respectfully submitted,

                    DANIELLE R. SASSOON,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

JACOB H. GUTWILLIG,
JACOB R. FIDDELMAN,
    *Assistant United States Attorneys,*
           *Of Counsel.*

———————

SPA 2 (noting that Government's untimeliness argument was "substantial" but declining to consider it; "[i]n the event that the Court's denial of the Rule 33 motions on the merits were overturned, the Court would then take up the question of timeliness.")).

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 7,188 words in this brief.

DANIELLE R. SASSOON,
*United States Attorney for the*
*Southern District of New York*

By: JACOB R. FIDDELMAN,
*Assistant United States Attorney*

Addendum

**Add. 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 19 Cr. 696 (PAE) |
| ARI TEMAN, | OPINION & ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by defendant Ari Teman to adjourn his surrender date of October 10, 2023, pending resolution of one of Teman's two recent *pro se* motions for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons that follow, the Court denies the motion to adjourn the surrender date.

**I.    Background**

On January 29, 2020, following a four-day trial, a jury convicted Teman on two counts apiece of bank fraud and wire fraud. Dkt. 92. These charges arose from Teman's having drawn and deposited checks on the accounts of three of his home-security company's customers, while falsely representing to the depository and clearing banks that the customers had knowingly authorized these checks. The checks consisted of (1) two checks totaling $36,000 which Teman drew and deposited on March 28, 2019, one on the account of customer 518 West 204 LLC ("518 West 204") and the other on the account of customer 18 Mercer Equity Inc. ("18 Mercer"); and (2) 27 checks totaling $297,000, which Teman drew and deposited on April 19, 2019, on the accounts of 518 West 204 and of another customer, the affiliated entities ABJ Milano LLC and ABJ Lennox LLC (together, "ABJ").

1

**Add. 2**

On June 5, 2020, the Court, in a 107-page decision, rejected Teman's numerous post-trial motions, under Rules 29 and 33. Dkt. 138 ("Rule 29/33 Decision").

On July 28, 2021, following Teman's terminations first of his trial counsel and later of his initial team of sentencing and appellate counsel, the Court sentenced Teman principally to a sentence of 12 months and one day's imprisonment, below the applicable Guidelines range of 30 to 37 months' imprisonment, to be followed by a three-year term of supervised release. The Court imposed the same sentence on each count with the sentences to run concurrently. The Court, over objection, granted Teman release on bail pending appeal. Dkt. 253.

On September 2, 2021, Teman terminated Susan G. Kellman, Esq., and Andrew J. Frisch, Esq., the retained counsel who had effectively represented him at sentencing and who had been retained to handle Teman's appeal. Dkt. 275. Teman was thereafter represented on appeal by retained counsel, Eden Quainton, Esq. Teman elected, however, to proceed *pro se* in this Court, and represented to the Court that he did not intend to file any motions and would leave any motions to his appellate counsel. *Id.*

On June 8, 2023, a unanimous panel of the United States Court of Appeals for the Second Circuit affirmed Teman's convictions. The Circuit rejected Teman's claims, which included improper venue, constructive amendment, instructional error, a defective verdict form, judicial misconduct, and prosecutorial misconduct. As to one claim, of ineffective assistance of counsel, the Circuit held that it should be pursued under 28 U.S.C. § 2255, to enable development of a factual record, in particular, to enable Teman's trial counsel to explain their decision to call Teman's business lawyer, Ariel Reinitz, Esq., in support of an attempted advice of counsel defense. On August 18, 2023, the Circuit's mandate issued. Dkt. 380.

2

**Add. 3**

On June 15, 2023, the Court, crediting Teman's claim to have run out of funds, appointed Karloff C. Commissiong, Esq., of the District's Criminal Justice Act panel, to represent Teman in connection with the anticipated § 2255 petition and matters preliminary to surrender.  Dkt. 367.  The Court advised Teman to order his affairs consistent with a surrender date set eight weeks after issuance of the Second Circuit's mandate.  *Id*.  The Court has since set a surrender date of October 10, 2023.[1]  Dkt. 377.  That date honored Teman's request for an extension of the surrender date as originally contemplated, to enable him to observe religious holidays.  *See* Dkts. 374–75.

Teman has recently submitted two *pro se* motions under Rule 33.  The first pursues a theory of new evidence.  Filed September 15, 2023, it claims that an August 2021 letter to the Court from Shelly J. Pecot, a shareholder of 18 Mercer, a cooperative building, and board emails furnished to him by Pecot, undermine the trial testimony of 18 Mercer's treasurer and outside real estate manager that 18 Mercer had not authorized Teman to create and deposit the $18,000 check on 18 Mercer's account that he deposited on March 28, 2019.  *See* Dkt. 386 & Exs. 1–8.

The second motion pursues a theory of misconduct.  Filed September 21, 2023 and styled an "emergency letter motion," it claims that Teman's initial sentencing and appellate counsel colluded with the United States Attorney's Office to withhold the above purportedly exculpatory evidence relating to 18 Mercer.  Dkt. 388.

In light of the subject-matter overlap between these two motions and Teman's anticipated § 2255 motion, the Court has directed the Government to file a consolidated response to the three

---

[1] The Bureau of Prisons, heeding a recommendation by the Court made at Teman's request, *see* Dkt. 378, has designated Teman to the FCI-Miami facility.

**Add. 4**

motions. The Court has stated that it will set the deadline for the Government's filing of its consolidated response after Teman files the § 2255 motion. Dkt. 387, 389.

On September 26, 2023, Teman's appellate counsel appeared in this Court, stating that Teman had retained him for the limited purpose of moving for an extension of the October 10 surrender date. Counsel's motion argued that the Rule 33 motion that Teman filed on September 15 should be resolved before Teman's surrender. Dkt. 394.

On September 27, 2023, the Court directed the Government to respond, within one week, to the motion seeking an extension of the surrender date, while stating that the surrender date remained in place and advising Teman to order his affairs in the expectation that the date would remain as set. Dkt. 397. On October 4, 2023, the Government submitted its response. Dkt. 399 ("Gov't Opp."). On October 5, 2023, Teman, through his appellate counsel, filed a reply. Dkt. 400.

**II.     Discussion**

As of this order, Teman has been released on bail for more than 44 months since the jury's verdict, for more than 26 months since sentencing, and for almost four months since affirmance of his conviction. The issue at hand is whether the *pro se* Rule 33 motion regarding 18 Mercer that he filed on September 15 has a sufficient prospect of invalidating his four counts of conviction to warrant deferring further the service of his sentence.

In this decision, the Court does not definitively resolve the Rule 33 motion. The Court's judgment is that that motion is best resolved alongside Teman's forthcoming § 2255 motion, and after the Government's submission of a consolidated response to Teman's post-conviction challenges, pending and promised. But, the Court, having closely examined Teman's Rule 33 motion and measured it against the evidence at trial and the purported "new evidence" offered by

4

Add. 5

Teman, can confidently assess that motion's prospects of success as exceedingly low, so as to be, at best, asymptotic to zero. The Court accordingly denies Teman's motion to further put off his surrender.[2]

Rule 33 provides that, upon motion, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed R. Crim. P. 33(b)(1). "The defendant bears the burden of proving that he is

---

[2] In a series of *pro se* filings in late 2021 and early 2022, Teman made sweeping and largely dyspeptic allegations of misconduct. These took aim at his trial attorneys, his sentencing and appellate attorneys, Government counsel, the trial witnesses from his three customers, the trial witness from the bank that incurred the approximately $260,000 net loss from his frauds, and the Court. Teman also demanded sanctions from the prosecutors on this matter; demanded the Court's recusal; and, relevant here, stated that he intended to move for a new trial based on the new evidence relating to 18 Mercer. *See* Dkt. 303; *see also* Dkts. 265, 295, 301; *cf.* Dkt. 271. Teman stated that he had asked his "appellate team" to pursue a stay of the pending appeal until his anticipated Rule 33 motion had been made and resolved in the District Court. *See* Dkt. 303. In an order issued on February 18, 2022, the Court stated that its assessment was that none of Teman's grievances were meritorious—a conclusion later validated by the Second Circuit's affirmance, which rejected Teman's claims of prosecutorial and judicial misconduct and of a prejudicial conflict affecting his initial sentencing and appellate counsel. The Court stated that its intention was to defer addressing such claims pending the disposition of Teman's then-pending direct appeal. Dkt. 304.

In his limited-purpose appearance last week in which he moved to put off the surrender date, Teman's appellate counsel faults the Court for not resolving Teman's ostensible new evidence motion earlier. Dkt. 394. For multiple reasons, that argument is not well taken. As counsel acknowledges, Teman's filings in this Court were "admittedly non-linear and often couched in unhelpful language." *Id.* at 9–10. The Court, beyond reviewing Teman's screeds sufficiently to confirm that they lacked merit, did not have any duty to produce an opinion addressing such grievances as could be discerned within these filings while Teman's counseled appeal was pending. Further, Teman, who in electing to proceed *pro se* in this Court, had committed *not* to file any uncounseled motions before this Court, Dkt. 275, in fact never filed such a Rule 33 motion before the disposition of his appeal. He did not do so through Kellman and Frisch before he terminated them. He did not do so through his appellate counsel, Quainton—notwithstanding Teman's representation that he had instructed his "appellate team" to seek a stay of appeal in deference to a Rule 33 motion to be filed in this Court. Even now, Teman's appellate counsel has left the Rule 33 motion for Teman to make *pro se*, surfacing only to contest the surrender date.

Add. 6

entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 474 (2d Cir. 2009).

The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In exercising its discretion, the court must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *Id.* at 1414. Ultimately, the court must decide "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414. The court's Rule 33 authority should be used "sparingly" and only in "the most extraordinary circumstances." *Id.*; *see also United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020).

For at least the following three independent reasons, the "new evidence" Teman musters relating to 18 Mercer does not come close to meeting Rule 33's standards.[3]

### A. Teman's "New Evidence" is Not Exculpatory—or New

---

[3] Apart from being meritless, Teman's motion may also be time-barred. A Rule 33 motion for a new trial based on newly discovered evidence "must be filed within 3 years after the verdict." Fed. R. Crim. P. 33(b)(1). The jury rendered its verdict on January 29, 2020, *see* Dkt. 92, but Teman, despite stating an intention to file a Rule 33 motion based on Pecot's materials, did not do so until September 15, 2023, *see* Dkt. 386, more than three years and seven months after the verdict. For the purposes of this decision resolving Teman's motion to adjourn his surrender date, the Court assumes *arguendo* that the Rule 33 motion is timely. The Court will take up the question of timeliness later, in the course of definitively resolving the Rule 33 motion.

Add. 7

Only one check among the 29 on which Teman's fraud convictions were based involved 18 Mercer and thus even potentially could be implicated by Teman's purported "new evidence." Even as to that check, this evidence does not undermine the overwhelming trial evidence that 18 Mercer—contrary to Teman's representation to the banks—had not authorized him to draw or negotiate that check on its account.

The trial testimony on that point came from two witnesses. The first was Bonnie Soon-Osberger, 18 Mercer's treasurer. *See generally* Trial Transcript ("Tr.") 415–69.[4] She testified that she had met Teman in October 2017 at a convention at which he was promoting the "smart technology" intercom product of his company, GateGuard, Inc.; that after discussions with Teman, 18 Mercer, in early April 2018, purchased the intercom for $2,499, plus an $849 installation fee and a $49.99 monitoring plan; that Teman did not state anything about a possible cancellation or device removal fee; and that the contractual terms and conditions in place at the time of the purchase, which 18 Mercer's board had approved, did not say anything about such fees or authorize Teman to draw checks on 18 Mercer's account for any purpose. *See* Tr. 419–441; *see also* GX 431 (Teman invoice); GX 441 (GateGuard terms and conditions, downloaded March 23, 2018). Soon-Osberger also testified about an email exchange in which Teman assured her that he would not enforce certain provisions of his terms and conditions against 18 Mercer, including one relating to whether the intercom was being licensed to (as opposed to being purchased by) 18 Mercer. GX 442 (April 2, 2018 emails). Soon-Osberger testified that 18 Mercer could not have entered into an agreement delegating to a vendor the ability to write checks on its account, including because its real estate management company alone had authority to sign checks on its behalf. Tr. at 429–30, 451–52, 461. Soon-Osberger testified that she

---

[4] For the trial transcript, *see* dockets 99, 101, 103, 105, 107, and 109.

7

Add. 8

received an invoice from Teman, for the intercom, at the time of its purchase, which 18 Mercer paid by check. Tr. 434–36.

However, Soon-Osberger testified, 18 Mercer had problems with Teman's device which Teman proved unable to correct. After a lengthy period, Soon-Osberger told Teman that 18 Mercer needed to "move on" because the device "just didn't work." Tr. 437–38. Teman responded by threatening that, if 18 Mercer removed the device, he would charge it an $18,000 fee, put a lien on its building, and sue the members of its board; these statements shocked Soon-Osberger. Tr. 438–41, 467–68; *see also* GX 443 at 5–6 (January 7, 2019 from Teman). Shown a copy of the $18,000 check to "GateGuard, Inc." that Teman drew and negotiated on 18 Mercer's account on March 28, 2019, and which bore the notation "device removal fee," Soon-Osberger emphatically denied authorizing Teman or anyone else to create or deposit that check. Tr. 441; *see also* GX 202 (photocopy of disputed check).

The second witness was Gina Hom, vice president of Crystal Real Estate Management ("Crystal Management"). *See generally* Tr. 469–83. She testified that Crystal Management oversaw day-to-day operations at 18 Mercer, including paying expenses, and that she and a colleague alone had authority to approve or sign checks on its account. Tr. 470–71. She testified that, before paying a check on 18 Mercer's account, Crystal Management was required to receive an invoice and obtain board approval. Tr. 473–74. She testified that upon discovering the $18,000 check Teman had drawn and negotiated on 18 Mercer's account on March 28, 2019, she had been "shocked," and that she called the bank to put a stop payment on the check, which had overdrawn 28 Mercer's account, as unauthorized. Tr. 475–76. Hom testified that despite having earlier received an invoice for the installation of GateGuard's intercom, Teman never sent her an

8

Add. 9

invoice for an $18,000 device removal fee. She, too, emphatically denied that 18 Mercer's board had authorized payment of that sum. Tr. 474–76.

There was also compelling circumstantial evidence corroborating that Teman had knowingly acted without authority in making and negotiating the 18 Mercer check (and the 28 checks he drew on the accounts of 518 West 204 and ABJ) and had dissembled in representing to the banks that he had such authorization. Teman's unilateral conduct markedly deviated from his ordinary practice of invoicing the customer and awaiting payment by check. This conduct also occurred after an angry business dispute with the customers in which Teman had made retaliatory threats. The evidence also showed that Teman was facing financial trouble at the time he commenced drawing checks on customers' accounts. The checks, including the $18,000 one drawn on 18 Mercer's account, also far outstripped in value the several thousand dollars each customer had paid for its device. *See* Rule 29/33 Decision at 4–6. Finally, as to 518 West 204 and ABJ, whose principals were Orthodox Jews, Teman deposited the April checks on the Passover weekend, when they could not access their electronic devices, an action that could reasonably be read to bespeak Teman's awareness that the customers had not assented to and would contest the checks. *See id*. at 40–41. Indeed, as the Second Circuit noted in its affirmance, Teman had threatened one of the customers, "I will . . . place a lien on your building on Pessach." GX 380 at 8 (citation omitted).

Teman also negotiated the March 2019 checks in the face of advice from his counsel, Reinitz. In text messages preceding Teman's drawing the $18,000 check, Reinitz responded to Teman's proposal to draw checks on customers' accounts, writing, flatly, "No" and "[b]ad idea." GX 702 at 1. In the same messages, Reinitz wrote to Teman that customers "are likely to call police. And you will be arrested. And have a criminal case to deal with. And then you can start

9

**Add. 10**

explaining about your 'contract' and 'not breaking any laws.'" *Id.* Presciently, Reinitz predicted that "you are >50% likely to be arrested for the activities you propose." *Id*. at 2.

The purported "new evidence" to which Teman points does not, in the least, undermine Soon-Osberger's or Hom's central testimony: that 18 Mercer *never* authorized Teman to draw the $18,000 check on its account. That evidence consists of an August 21, 2021 letter from shareholder Pecot to the Court, and several emails among the board, or with Teman, that Pecot supplied to Teman. *See* Dkt. 386, Exs. 1–8. In the part of Pecot's letter on which Teman's motion relies, she states that Teman had warned her and other shareholders of fees, including a possible $18,000 device removal fee, and that Teman had stated that he believed he had the right to "draft owed monies from our bank account." Dkt. 386, Ex. 3 at 1.

Critically, Pecot's letter does not situate Teman's statements about an $18,000 fee in time. And, critically, Pecot does not state that Teman made statements to this effect at the time 18 Mercer entered into its agreement with GateGuard to purchase the $2,499 intercom, let alone that 18 Mercer had ever agreed to such improbable terms. Tellingly, Pecot does not claim to have been a participant in or percipient witness to the process by which the agreement between 18 Mercer and GateGuard was entered into. She admits the contrary. *See id.* ("I have no direct knowledge of Mr. Teman's interactions with the board or management."). And she does not point to any writing or other interaction in which 18 Mercer's board or representative agreed to cede authority to outside vendor Teman to draw checks on the cooperative's bank account, in general or for an $18,000 device removal fee.

The emails that Pecot supplied as supporting that Teman at some point warned 18 Mercer that he might draw an $18,000 check are instead wholly consistent with Soon-Osberger's trial testimony. These emails begin in late 2018, *after* 18 Mercer sought to "move on" from Teman's

10

Add. 11

device and *after* Teman, angered, began threatening retaliation.  *See, e.g.,* Dkt. 386, Ex. 2 at 1 (December 3, 2018 email from an 18 Mercer board member, noting October 5 and 22 Teman emails stating that it would cost $18,000 to disable the device and threatening a lien on the building and a lawsuit).  Soon-Osberger testified to that very effect: that, in the period leading up to his deposit of the $18,000 check, Teman threatened to impose an $18,000 device-removal fee. She testified about emails from Teman so threatening, including one that was received at trial. *See* Tr. 439; GX 443 (email string including January 7, 2019 email from Teman to Soon-Osberger, Pecot, and other shareholders, stating, "As a reminder, you are not allowed to touch or move our device and there's an $18,000 fine for removing it.").

Pecot's letter, and the emails she supplied Teman, indicating that Teman had threatened 18 Mercer with an $18,000 charge, therefore do not qualify as new evidence.[5]

And these emails are not, at all, exculpatory.  To state the obvious, that Teman, angry about 18 Mercer's repudiation of his device, preceded his drawing the $18,000 check with a threat to do so does not demonstrate that 18 Mercer, at the time of contracting or any time

---

[5] Indeed, as the Government demonstrates, the defense before trial was aware of the substance of Pecot's account, including that she had had extensive emails with Teman in the run-up to his deposit of the $18,000 check and that Teman had threatened 18 Mercer with an $18,000 removal fee.  *See* Gov't Opp. at 5–6, 8.  The defense possessed Pecot's emails with Teman between October 2018 and January 2019 in which he sought to maintain the GateGuard intercom system at 18 Mercer and in which Pecot sought to broker a resolution.  After attempting shortly before trial to subpoena Pecot for testimony, and, upon learning that she was out of the country, the defense identified Teman's email communications with Pecot as a potential defense trial exhibit, although it ultimately did not offer these.  *Id.* at 4 & Ex. A.

The March 29, 2018 email exchange that Teman attaches between himself and Soon-Osberger is also not new evidence.  It concerns GateGuard's terms and conditions.  *See* Dkt. 386, Exs. 4–5. Soon-Osberger testified about this exchange at trial.  *See* Tr. 431–32.  A fuller email string including the same exchange was admitted during her direct testimony.  *See* GX 442.  The email and the terms and conditions it addresses do not grant Teman authority to draw checks on 18 Mercer's account or to impose an $18,000 device removal fee.  The remaining emails from within 18 Mercer that Teman cites also do not address these subjects.  *See* Dkts. 386, Exs. 6–7.

**Add. 12**

thereafter, had ever authorized him to impose such a charge or to draw a check for such charge upon the cooperative's bank account.

For much the same reasons that Pecot's letter and these emails are not exculpatory and do not establish any consequential inaccuracy in Soon-Osberger's or Hom's testimony, they do not reflect the witness misconduct that Teman's Rule 33 motion intemperately alleges, to wit, "obstruction of justice by Hom and Soon-Osberger" and "bank fraud" by Hom in instructing Signature Bank to execute a chargeback on the $18,000 check. Dkt. 386 at 5.

Finally a non-event is Soon-Osberger's email to shareholders that "I believe that anyone [who] has direct contact with him before or moving without going through our management will have legal liability." Dkt. 386, Ex. 1 at 5. Teman suggests that this email concedes that 18 Mercer was legally liable to Teman. That is wrong. In context, the email warned shareholders to steer clear of Teman. *See id.* ("It is unfortunately [sic] that he has [a] very bad reputation and it aligns with his behavior to make repeat legal threats."). As the Government explains, the full email chain on which Teman's Rule 33 motion relies for this point reflects that the discussion within 18 Mercer of legal liability referred to Teman's threat of legal action, not a determination that 18 Mercer was, in fact, liable. *See* Gov't Opp. at 7.[6]

**B. Teman's "New Evidence" Does Not Support His Trial Theory of Defense**

Teman's purported "new evidence" also does not nothing to fortify his theory at trial as to how 18 Mercer—and his other customers—ostensibly authorized him to draw checks on their

---

[6] For the above reasons, and those recited in the Government's opposition, Teman's related claim of a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, in connection with the evidence from 18 Mercer on which he relies, is baseless. *See* Gov't Opp. at 5–6, 8. Teman earlier made a *Brady* claim after trial relating to the other two customers, 504 West 120 and ABJ, which the Court denied. *See* Rule 29/30 Decision at 87–107.

**Add. 13**

bank accounts and for device removal and other fees.  That theory, which was unsupported by the trial evidence, remains unsupported.

Teman's trial defense was based upon the fact that his company's contractual terms and conditions stated that they were subject to additional "Payment Terms" and identified a URL. The defense elicited from Soon-Osberger on cross-examination that she had not clicked on the URL.  Tr. 449–50.

Teman, however, failed at trial to adduce any evidence supporting the premise of this line of defense: that the Payment Terms in place at the time GateGuard had contracted with the three customers had given GateGuard authority to draw checks on customer accounts and to charge fees such as the $18,000 device removal fee.  No witness from 18 Mercer, 518 West 204, or ABJ so testified.  Nor did any other witness called by the Government.

On the defense case, Teman called his lawyer, Reinitz, in support of an attempted advice of counsel defense, to recount conversations with Teman in late 2018 and early 2019.  But the sole version of the Payment Terms that Reinitz could authenticate was one that stated that it had been revised on January 27, 2019.  *See* DX 2.  That was long after each customer had contracted with GateGuard—and, importantly, after Teman's ire at each customer had been provoked by its attempts to end the relationship with GateGuard.  Although Reinitz testified that Teman had told him these Payment Terms had been in place earlier, this testimony was hearsay; the Court therefore instructed the jury that it could not consider Teman's statement for the truth of the matter asserted.  Teman did not testify.  Nor did Teman attempt by any other means at trial to establish the Payment Terms in place when the customers had contracted.  *See* Rule 29/33 Decision at 4 n.5 (citations omitted).

13

**Add. 14**

Accordingly, as the Court recapped in denying Teman's post-trial motions, "there was no competent evidence at trial that the relevant aspects of the Payment Terms had been in place at the times any of the Customers contracted with Teman." *Id.*

Had there been any truth to Teman's claim that the linked Payment Terms at the time of contracting had authorized his offense conduct, Teman had every incentive to come forward with this after trial. Strikingly, in the 44 months since trial and the 40 months since the Court called out that deficiency, Teman has not done so—or even tried. Teman's present round of Rule 33 motions remains devoid of such evidence.[7] And Pecot's August 2021 letter to the Court and the associated emails do not speak to the Payment Terms at all, let alone the content of these terms at the pertinent point, when 18 Mercer contracted with GateGuard.

For this reason, Teman's attempts to characterize his disagreements with his customers over the 29 checks as mere civil payment disputes regarding the effect of online or clickwrap contract terms, and thus as ill-befitting a federal fraud prosecution, *see, e.g.*, Dkt. 394 at 7 n.3, cannot be taken seriously. Teman failed completely to offer any evidence that the Payment Terms on which his trial defense rested were in place at the time of contracting. The assembled evidence instead overwhelmingly established that Teman acted with intent to defraud. He was well aware that his customers had not consented to the comically outsized fees and charges reflected in the 29 checks to GateGuard, including the $18,000 check drawn on 18 Mercer's account. He was also well aware that his customers had not consented to his drawing and

---

[7] Insofar as evidence about the Payment Terms at the relevant times almost certainly would have been in GateGuard's custody and control, such evidence likely could not have qualified as new evidence under Rule 33. *See, e.g.*, *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980) (only evidence that "could not with due diligence have been discovered before or during trial" is cognizable on a Rule 33 motion). Regardless, Teman's sustained inability to muster any such evidence is telling.

**Add. 15**

negotiating checks on their accounts. He nonetheless represented to the depository and clearing banks that 18 Mercer (and 504 West 204 and ABJ) had authorized the checks that he presented for deposit.

### C. Teman's "New Evidence" Does Not Bear Upon 28 of the 29 Fraudulent Checks and Cannot Affect the Convictions on Counts One and Three

Even assuming—incorrectly—that Pecot's letter and emails called into question whether 18 Mercer's board had authorized Teman to draw the March 28, 2019 check for $18,000 on its account, those materials have no bearing on whether Teman had authorization to draw the remaining 28 checks that he negotiated to enrich himself. These totaled $315,000 and were drawn on the accounts of the other customers, 518 West 204 and ABJ.

Critically, too, the 18 Mercer check was the subject (along with the other $18,000 check Teman negotiated on March 28, 2019, on the account of 518 West 204) of only two of the four counts: Counts Two and Four. The remaining two counts, Counts One and Three, charged Teman with bank fraud and wire fraud, respectively, in connection with the 27 checks he deposited on April 19, 2019. Because none of those 27 checks was drawn on 18 Mercer's account, any new evidence relating to 18 Mercer could not disturb Teman's convictions on those two counts. And because the Court imposed the same concurrent sentence on all four counts, Counts One and Three independently support Teman's prison sentence.

Moreover, for various reasons canvassed in the decision resolving Teman's post-trial motions, the proof of Teman's fraudulent intent was even stronger as to the second round of checks. *See* Rule 29/33 Decision at 8–11.

For one, in between the two rounds, Bank of America had placed a hold on the first two checks, and, on April 2, 2019, completed chargebacks from the GateGuard accounts. That drove home the absence of customer authorization. For another, Teman had a new round of texts with

Add. 16

Reinitz, between April 2 and 10, 2019. Alerted to Teman's deposit of the first two checks, Reinitz wrote: (1) "Not sure I follow but this sounds bad"; (2) "I don't know all the ins and outs of this but sounds like a bad idea"; (3) "If you are hitting their accounts out of the blue, I expect this will become a criminal matter sooner or later"; (4) "I've already told you I think it's a bad idea . . . . If you hit their accounts I think 50/50 they call cops. If I was advising them that's probably what I would tell them to do"; (5) "The banking stuff is not a joke . . . . You can't just hit someone's bank account if you know they dispute the charge"; and (6) "[I]f the payer tells you to stop, you must stop." *Id.* at 9 (citations omitted). Reinitz's memorable warnings put Teman on yet further notice that his actions were unauthorized. Despite these warnings, Teman—without notifying Reinitz that he would do so—escalated his practice of "hit[ting]" customer accounts more than 10-fold, by depositing, on April 19, 2019, an additional 27 customer checks into the GateGuard account.

For all these reasons, it is not a manifest injustice to let the jury's guilty verdict stand. Far from it: that verdict was supported by overwhelming evidence. And the ostensible "new evidence" on which Teman relies does not, at all, call that verdict into question. There is no basis to adjourn Teman's surrender any longer.

### CONCLUSION

For the reasons above, Court denies Teman's motion to extend his surrender date. That date remains October 10, 2023.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 394.

16

Add. 17

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 6, 2023
    New York, New York