# 24-345-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR
## DEFENDANT-APPELLANT

Thomas J. Butler, Esq.
Attorney for the Defendant-Appellant
350 Northern Blvd., Suite 324-1032
Albany, New York 12204
(877) 847-1896

## <u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ....................................................................... ii

ARGUMENT ........................................................................................1

POINT I

      THE DISTRICT COURT ERRED IN DENYING TEMAN'S
      RULE 33 MOTIONS............................................................................1

          A.     The Court Should Reverse the District Court's
                     Ruling on Teman's Rule 33 Motion Regarding
                     New Evidence as to 18 Mercer and in Not
                     Holding a Hearing ...................................................1

          B.     The Court Should Reverse the District Court's
                     Ruling on Teman's Rule 33 Motion Regarding
                     New Evidence As to Soleimani and in Not
                     Holding a Hearing ..................................................15

                   1.     Teman's Rule 33 Motions Were Timely .......................22

CERTIFICATE OF COMPLIANCE......................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

Brady v. Maryland, 373 U.S. 83 (1963) ...........................................1-3, 12-13, 20-21

Cooper v. Graham, Case No. 10-cv-6467, 2011 U.S. Dist. LEXIS 132625 (W.D.N.Y. Nov. 17, 2011)............................................................................2

Giglio v. United States, 405 U.S. 150 (1972) ................................. 1, 3, 12-13, 20, 22

Hughes v. Phillips, 457 F. Supp. 2d 343 (S.D.N.Y. 2006).......................................4

Government of Virgin Islands v. Fahie, 419 F.3d 249 (3d Cir. 2005) ...............3, 21

Kyles v. Whitley, 514 U.S. 419 (1995) .........................................................3, 13, 20

Sanders v. Sullivan, 863 F.2d 218 (2d Cir. 1988) ............................................11, 21

Schledwitz v. United States, 169 F.3d 1003 (6th Cir. 1999)............................13, 20

United States v. Alessi, 638 F.2d 466 (2d Cir. 1980)..........................................9, 15

United States v. Andrews, 532 F.3d 900 (D.C. Cir. 2008)..................................3, 20

United States v. Brock, 789 F.3d 60 (2d Cir. 2015) .................................................11

United States v. Brooks, 966 F.2d 1500 (D.C. Cir. 1992).........................................2

United States v. Cuffie, 80 F.3d 514 (D.C. Cir. 1996) ......................................3, 21

United States v. Disston, 582 F.2d 1108 (7th Cir. 1978)..................................15, 22

United States v. Forbes, 790 F.3d 403 (2d Cir. 2015) ...............................................1

United States v. Madori, 419 F.3d 159 (2d Cir. 2005) ......................................13, 22

United States v. Meregildo, 920 F. Supp. 2d 434 (S.D.N.Y. 2013) ...................3, 20

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) ................................................2

United States v. Owen, 500 F.3d 83 (2d Cir. 2007) ...........................................10, 18

United States v. Payne, 63 F.3d 1200 (2d Cir. 1995) .........................................10, 19

United States v. Petrillo, 821 F.2d 85 (2d Cir. 1987) .........................................10, 19

United States v. Quinn, 537 F. Supp. 2d 99 (D.D.C. 2008) ......................................2

United States v. Risha, 445 F.3d 298 (3d Cir. 2006)..................................................2

United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007) ...................................3, 20

United States v. Stofsky, 527 F.2d 237 (2d Cir. 1975)......................... 12, 14, 21-22

United States v. Walker, 289 F. Supp. 3d 560 (S.D.N.Y. 2018) .......................11, 19

United States v. Wallach, 935 F.2d 445 (2d Cir. 1991)....................................11, 21

United States v. Wong, 78 F.3d 73 (2d Cir. 1996) ............................................10, 19

Valentin v. City of Rochester, 2018 U.S. Dist. LEXIS 182601
(W.D.N.Y. Oct. 24, 2018)..........................................................................................2

Wiercinski v. Mangia 57, Inc., 787 F.3d 106 (2d Cir. 2015) ..................................11

## ARGUMENT

## POINT I

## THE DISTRICT COURT ERRED IN DENYING TEMAN'S RULE 33 MOTIONS.

### A. The Court Should Reverse the District Court's Ruling on Teman's Rule 33 Motion Regarding New Evidence as to 18 Mercer and in Not Holding a Hearing.

A court may grant a new trial based on newly discovered evidence "only upon a showing that (1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." See United States v. Forbes, 790 F.3d 403, 406-07 (2d Cir. 2015).

The Ms. Pecot/Ms. Crimmins evidence goes to central issues of credibility and *mens rea* that had been withheld and only discovered after Teman's sentencing that is reversible error. The new evidence is material and it raises genuine issues of guilt or innocence relating to Teman's *mens rea* and witnesses' knowledge of key contractual provisions in GateGuard's Terms and Conditions. The new evidence also raises substantial questions under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), as the new evidence is both exculpatory and relevant for impeachment purposes. Moreover, it is not credible that the government was unaware of the relevant emails of its own

1

witnesses, or if it was, it abdicated its basic duties to conduct a proper pre-trial investigation of the facts.  See Cooper v. Graham, Case No. 10-cv-6467, 2011 U.S. Dist. LEXIS 132625, at 7 and Note 2 (W.D.N.Y. Nov. 17, 2011)(Failure to make appropriate inquiry runs afoul of defendants' due process rights).

The government presented Soon-Osberger as one of its key witnesses and could easily have obtained her relevant emails.  Even if Pecot was unavailable for trial, her communications, as well as Ms. Hom's could readily have been obtained and reviewed by the government once it became clear from Soon-Osberger's emails that there was material correspondence with Pecot and Ms. Hom relevant to the government's core theory.  The failure to obtain and produce such evidence comes within Brady.  See Valentin v. City of Rochester, 2018 U.S. Dist. LEXIS 182601, at *3 (W.D.N.Y. Oct. 24, 2018), aff;d, 783 F. App'x 97 (2d Cir. 2019)(Prosecutor suppressed information within the meaning of Brady because such information was "readily available"); United States v. Quinn, 537 F. Supp. 2d 99, 110 (D.D.C. 2008)(Government cannot turn "a blind eye to the evidence" or make a "conscious decision that information need not be pursued further or disclosed" to defendant); United States v. Risha, 445 F.3d 298, 307 (3d Cir. 2006)(The Prosecutor may still be considered to have suppressed evidence if he has not sought out information readily available to him)(Nygaad J. dissenting); United States v. Brooks, 966 F.2d 1500, 1504 (D.C. Cir. 1992)(U.S. Attorney's

Office ordered to review files that may contain material exculpatory information); United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991)(Prosecutor cannot avoid finding out what "the government" knows simply by declining to make a reasonable inquiry of those in a position to have relevant knowledge); Kyles v. Whitley, 514 U.S. 419, 437 (1995)(A prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

Indeed, "the Government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense." See United States v. Meregildo, 920 F. Supp. 2d 434, 438-39 (S.D.N.Y. 2013); United States v. Rodriguez, 496 F.3d 221, 225-26 (2d Cir. 2007)("This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions"). In Giglio, the Supreme Court explained that Brady "held that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." Courts have universally granted new trials where the Government violates Brady and/or Giglio. See United States v. Andrews, 532 F.3d 900, 905 (D.C. Cir. 2008)("If the undisclosed evidence is material, a new trial is required"; Government of Virgin Islands v. Fahie, 419 F.3d 249, 252 (3d Cir. 2005)("the Court has assumed that *Brady* violations that have affected the

judgment of a jury normally will be remedied by a new trial…"); United States v. Cuffie, 80 F.3d 514, 517 (D.C. Cir. 1996)("Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict"). Information is not considered "suppressed" if the defendant could have discovered the evidence on his or her own, exercising due diligence. See Hughes v. Phillips, 457 F. Supp. 2d 343, 360 (S.D.N.Y. 2006).

Soon-Osberger refused to comply with the defense subpoena and Pecot was out of the country at the time of the trial. (SA-106) The defense also did not know that Ms. Hom had been copied on material emails between the 18 Mercer Board Members.

As such, the 18 Mercer witnesses Soon-Osberger and Hom allegedly being shocked by learning about the deposit is inconsistent with being warned by Pecot about the same fees, which Hom allegedly hid it. Hom also testified she did not ask anyone on the 18 Mercer Board whether the check was authorized. (A-612:22-25).

The first email provided by Pecot was dated October 28, 2018, from "Margaret," whom Teman knew to be Ms. Crimmins, an 18 Mercer shareholder and Board member. (DE395, SA-231-32) This email was never provided to Teman by the government, by Soon-Osberger nor by Hom, who had been

subpoenaed by Teman's defense team. (SA-173-74) Neither Soon-Osberger nor Hom responded to their subpoenas and this should be investigated. (Sa-173-74) It constitutes as material impeachment evidence because Soon-Osberger testified at trial she was "shocked" three months later when Teman reminded her, Pecot and Jackie Monzon, who was the President of 18 Mercer's management company, that the device removal would incur an $18,000 fee. (A-576, A-162). Ms. Crimmins email indicates that Soon-Osberger had already been warned months earlier that she would incur "legal liability" by removing the GateGuard device.

Even more importantly, Ms. Crimmins's statement that Soon-Osberger was "legally liable" for her conduct in removing the GateGuard underscores that Soon-Osberger had been expressly told, not just by Teman, but also by a fellow Board member, that there was "legal," which in this case can only mean "contractual," basis for liability. This contractual liability can only stem from the GateGuard Terms and Conditions, at trial.

The Ms. Crimmins's email via Teman's argument undermines the government's core theory: that Teman's commercial counterparts did not know about and thus could not have authorized GateGuard's enforcement of its contractual rights. As such, Teman's argument is also that the removal fees charged against the ABJ entities operated by Soleimani, who was in control over one of GateGuard's other customer's ABJ Properties, would have appeared in a

much different light if the jury had heard testimony or seen documents showing or even tending to show that an $18,000 device removal fee was something that GateGuard customers knew about and for which they believed they had contractual legal liability. The communication chain between 18 Mercer and Teman shows that Teman reminded 18 Mercer of the contract terms and that both Hom and Soon-Osberger were aware of the removal fees even though they denied knowledge at trial. SA-110-19.

The second email sent by Pecot provides additional evidence, which undermines the government's core theory and establish Teman's innocence. In this email, on December 3, 2018, again long before the email that allegedly "shocked" Soon-Osberger, Ms. Crimmins wrote:

> By 'the board' so you mean Bonnie and Stephanie? I'm a board member and I have no idea where things stand with the intercom.
> **The last communications from Ari Teman:**
> 10/5 An e-mail from Ari stated that there was a 10-year contract and he would put a lien on the building.
> 10/22 The next e-mail from Ari stating that it would cost $18,000 to disable the device and $10,000 in collections if he wasn't paid in full.
> **The last communication from Bonnie.**
> 10/22 An e-mail to Ari stating that he would hear from our attorney that week.
> And that's the only information the shareholders have. Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?

(SA-108-109, SA-151)

This email would have been of great importance to the defense. First, the email stresses that the Board members who were involved in the dispute with GateGuard included not only Soon-Osberger, but also Stephanie Phipps, who knew of the contractual issues surrounding the GateGuard device removal. Second, Soon-Osberger knew there was a contractual issue and potential litigation, not because of the threat from Teman, but because of a demand for information from a fellow Board member, who cannot have been alone in wanting answers – many months before GateGuard exercised its right to draw 18 Mercer's account with an RCC.

Second, Ms Crimmins copied Ms. Hom of 18 Mercer's management company, Crystal Management on her email. Yet, Ms. Hom testified at trial that she was unaware that 18 Mercer had a contract with GateGuard and that she believed the extent of the relationship between GateGuard and 18 Mercer was that 18 Mercer had hired GateGuard to install a new intercom system. (A-615-16). The relevant exchange between Teman's counsel and Ms. Hom on cross-examination was as follows:

Q.     Ma'am, you were aware that Mercer had a contract with GateGuard, correct?

A.     No.

Q.     You weren't aware of that?

7

A.    I was not aware they had a contract.  I know that they had an agreement on them.

Q.    Okay.

A.    As far as I know.

Q.    Well, what's your understanding of the agreement that you believed Mercer had with GateGuard?

A.    That they hired – 19 Mercer hired GateGuard to install the new intercom system.

Q.    Okay.  But that was the extent of your understanding of the business relationship between Mercer and GateGuard?

A.    Correct.

The second Ms. Crimmins's email proves that Ms. Hom was not being truthful.  The email establishes that Ms. Hom knew the relationship with GateGuard involved an alleged 10-year contract, an $18,000 device removal fee and potential litigation – far more than a simple agreement to install an intercom.  Moreover, it is simply not plausible that the representative of 18 Mercer's management company would have ignored an email as important as this one from a visibly angry shareholder.  Ms. Hom must have engaged in further conversations and exchanges about the $18,000 device removal fee and GateGuard's remedies, destroying her testimony, central to the government's theory, that GateGuard's

8

RCC to enforce the $18,000 fee came out of the blue, without any warning, "shocking" her into requesting a chargeback. (A-612).

When there is evidence of an undisclosed email, then there is no longer any reason to trust that full disclosure was made regarding emails between the Board members and Crystal Management concerning the GateGuard Intercom, the device removal fees and the remedies contemplated in the GateGuard Terms and Conditions. Ms. Crimmins sharply raises a host of questions ("Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?").

Perhaps, most importantly, the back and forth about the provisions of the GateGuard contract, combined with the acknowledgement and awareness that 18 Mercer was "legally liable" for a device removal fee under the GateGuard Terms and Conditions underscores the fundamentally commercial nature of this entire matter. There was a contract, there were fees and remedies, there was a dispute – the lifeblood of the commercial practice in New York Supreme Court – not a crime to be punished with forfeiture, restitution and incarceration. The fundamental challenge to the government's case was undermined by the government's limited production of material information and the defense's lack of critical evidence.

For the foregoing reasons, Teman has a meritorious argument that new evidence discussed entitles him to a new trial. Any motion for a new trial

grounded on newly discovered evidence must be filed within three (3) years after the verdict or finding of guilty. See Fed. R. Crim. P. 33(b)(1). Regardless of when Teman's motion is considered to have been made, it is timely.

In general, to vacate a conviction on the grounds of newly discovered evidence, the defendant must show that the evidence could not have been discovered with due diligence have been discovered before or during trial, that the evidence is material, not cumulative and the admission of the evidence would probably lead to an acquittal[1] because Teman could not have discovered the Ms. Crimmins and Soon-Osberger emails because Soon-Osberger had failed to comply with her subpoena and Teman had no means of knowing how other Board members had interacted with Soon-Osberger. The Ms. Crimmins emails are material because they show that Soon-Osberger and Ms. Hom, the government's only 18 Mercer witnesses were alerted that 18 Mercer was legally liable for device removal fees, which directly undercuts the government's core theory that GateGaurd's enforcement of its Terms and Conditions was a total "shock" to the witnesses who had no knowledge or recollection of the applicable provisions of the Terms and Conditions. This evidence was clearly not merely cumulative as there was nothing similar that had been offered by either the prosecution or the defense during trial.

---

[1] See Alessi, 638 F.2d at 479.

10

As a result, with respect to Counts II and IV, evidence that Soon-Osberger and Ms. Hom had been warned of legal liability under a 10-year contract for the device removal fee, not only by Teman, but by one of the 18 Mercer Board members would very probably have led to a determination that Teman not only actually believed he was entitled to issue RCCs to enforce the contractual provision, but also that he was contractually justified in doing so. This would have directly negated both Teman's mens rea and the core factual predicates for the government's case.

The test for Rule 33 motions often includes a requirement that the evidence be not "merely cumulative or impeaching." See United States v. Owen, 500 F.3d 83, 88 (2d Cir. 2007). This does not mean that newly discovered impeachment evidence can never justify a new trial, only that impeachment evidence cannot be "merely" impeaching. See United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)(No new trial where evidence merely furnishes "an additional basis" for impeachment of already questionably credible witnesses). Impeachment evidence would be material if the witness whose testimony is attacked "supplied the only evidence linking the defendant(s) to the crime." See United States v. Petrillo, 821 F.2d 85 (2d Cir. 1987). Soon-Osberger and Hom were the only witnesses who testified as to the nature of the GateGuard Terms and Conditions and the issuance of the GateGuard RCCs. Thus, "the likely impact on the witness[es]'s credibility

11

[of the new evidence] would have undermined a critical element of the prosecution's case." See United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995). A witness who lies to the jury loses credibility with that jury. See Payne, 591 F.3d at 60 ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses"; United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015)(a Court must defer to "the jury's assessment of witness credibility"); Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112-13 (2d Cir. 2015)(it is the jury's role to determine whether a witness is credible and to decide what weight to give to that witness's testimony). In note also, the communication chain between 18 Mercer and Teman shows that Teman reminded 18 Mercer of the contract terms and that both Hom and Soon-Osberger were aware of the removal fees even though they denied knowledge at trial. SA-110-19.

As to newly discovered evidence of perjured testimony, the standard for granting a new trial under Rule 33 is less stringent than the general rule discussed above. The critical factor in assessing the impact of allegedly perjured testimony is whether the government knew or should have known of the perjury. As this Court has stated:

> Courts in the Second Circuit apply two different standards when determining whether to grant a new trial based on newly discovered evidence that a

> Government witness likely perjured himself: If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

See United States v. Walker, 289 F. Supp. 3d 560, 566 (S.D.N.Y. 2018).

Where, as here, "the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." See United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991); Sanders v. Sullivan, 863 F.2d 218, 225 (2d Cir. 1988)(question is whether the jury's verdict 'might' be altered). If the government knowingly permitted the introduction of false testimony, reversal is "virtually automatic." See United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975). Indeed, even if the Government did not knowingly permit the introduction of false testimony, "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted. See Id., at 246-47.

For the reasons discussed above, the government should have known that Ms. Hom's testimony that she knew nothing about a GateGuard contract and that she believed GateGuard was a mere intercom installer was false. Ms. Hom was copied on an email in which the GateGuard contract, an $18,000 device removal

13

fee, and potential litigation with GateGuard over its Terms and Conditions were expressly discussed and in which a Board member pointedly demanded follow-up information – plainly not the type of situation a management company would have simply ignored or that the government would not have known about had it merely reviewed relevant emails to its own star witness. In this situation, there is a reasonable likelihood the jury would have reached a different judgment as to Counts II and IV – those involving 18 Mercer – and that its judgment as to Counts I and III would have been affected: if a key government witness for 18 Mercer was lying, why should the jury credit the testimony of witnesses for GateGuard's other commercial counterparts?

Also, the newly discovered evidence of <u>Brady-Giglio</u> violations provide an independent basis for a new trial. "When the defendant, as in this case, asserts the newly discovered <u>Brady</u> evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was 'material.' <u>See Schledwitz v. United States</u>, 169 F.3d 1003, 1011 (6th Cir. 1999). The United States Supreme Court has elaborated on the meaning of "materiality" in this context:

> A defendant need not *demonstrate* that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable

14

> evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

See Kyles, 514 U.S. at 434-35.

Here, the undisclosed evidence on its face not only raises substantial questions as to the existence of Teman's *mens rea* in the context of a contract dispute, but also, it suggests the presence of additional relevant emails further discussing the basis for contractual liability under GateGuard's Terms and Conditions. This would reasonably place the matter "in such a different light as to undermine confidence in the verdict" with respect to Counts II and IV, and likely, by "ricochet" with respect to Counts I and III.

To the extent the undisclosed evidence would undermine the credibility of Soon-Osberger and Hom, that too would affect confidence in the verdict. "*Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial." See United States v. Madori, 419 F.3d 159, 170 (2d Cir. 2005). Whether Teman defrauded 18 Mercer turned exclusively on Soon-Osberger's claimed ignorance of the relevant portions of the GateGuard Terms and Conditions and Hom's claimed ignorance of virtually everything about GateGuard and Teman.

The Ms. Crimmins emails also undermine the credibility of both Soon-Osberger and Hom on these points and are thus determinative on the question of

15

guilt or innocence as to 18 Mercer, as, without their reliable testimony, there was no basis to convict. Because the jury instructions made it possible for the jury to convict on a given count based on a unanimous determination as to any one customer and because the absence of a special verdict form or special interrogatories (A-1298.1) made it impossible to know which particular customer relationship underpinned the guilty determination, a lack of confidence in the 18 Mercer outcome undermines confidence in the jury's verdict in Counts II and IV as a whole, which included 18 Mercer and Coney Realty. Also, if the 18 Mercer witnesses were willing to lie, so too would have been other witnesses caught up in a potential litigation with GateGuard. Since Soon-Osberger and Hom were key witnesses in the Government's case in chief, the jury, if made aware of the foregoing, certainly 'might' have acquitted. See Stofsky, 527 F.2d at 246-47. Indeed, the jury would likely have rejected the prosecution's pleas to believe its witnesses' testimony and would have acquitted.

Further, there are limits to the district court's discretion not to hold an evidentiary hearing, especially when Governmental misconduct is alleged. Here, Government misconduct has been alleged and an Evidentiary hearing is necessary to insure an adequate record upon which to base an enlightened ruling. See United States v. Disston, 582 F.2d 1108, 1110-12 (7th Cir. 1978).

16

**B. The Court Should Reverse the District Court's Ruling on Teman's Rule 33 Motion Regarding New Evidence As to Soleimani and in Not Holding a Hearing.**

The answer brief argues that Teman did not motion under Rule 33 as to the new evidence regarding Soleimani and ABJ. However, Teman's Rule 33 motion dated September 21, 2023, indicates "The defendant preserves all issues in this document, as well as DOCS 384, 386, and 295 for appeal." (SA-173-187) In note, DE295, which is located in the Supplemental Appendix on appeal, at SA-120-141, asserts the argument related to Soleimani and ABJ. Therefore, Teman's argument is preserved for appeal.

As noted within Point I(A) of the initial brief, in general, to vacate a conviction on the grounds of newly discovered evidence, the defendant must show that the evidence could not have been discovered with due diligence before or during trial, that the evidence is material, not cumulative and the admission of the evidence would probably lead to an acquittal. See United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980). Here, as discussed, Teman could not have discovered the new evidence related to Soleimani (SA-120-43) because Soleimani had not produced the documents until after the underlying trial. (SA-120-43)

The new evidence is material because it shows that Soleimani discussed Teman's arrest in the underlying matter with Abi Goldenberg of Goldmont Realty Corp. who GateGuard was suing in the Southern District of New York for trade

17

secret theft months before Teman deposited the RCCs, in Case No.: 1:20-cv-01609, that Goldenberg had given Teman's suicide note to Soleimani, that Soleimani hired MVI Systems LLC (or "MVI"), which GateGuard was suing in the Southern District of New York, in Case No.: 1:19-cv-02472. (SA-120-43)

Also, the new evidence between Soleimani and MVI was that Soleimani hired MVI, who was GateGuard's competitor, to replace GateGuard, that Soleimani reviewed the contract Terms with MVI when Soleimani had testified he did not review the GateGuard contract Terms, that Soleimani, like GateGuard, also owed MVI monies ($13,000) for over a year, which goes toward Soleimani's history of owing monies with the same excuses to vendors such as GateGuard and MVI, that it was indeed ABJ's internet connection to cause Gateguard and also MVI devices not to work, which was contrary to Soleimani's testimony. (SA-120-43) Further, the new evidence would show that Soleimani was in business and had a revenue sharing agreement with MVI, which would indicate that Soleimani stood to save over $5.4 million by ending the agreement between ABJ and GateGuard, but stood to profit in his role as a certified dealer with a five percent (5%) revenue sharing agreement with MVI. This is important because Teman's defense would have been able to cross-examine Soleimani about MVI and show his motivation to prosecute Teman due to financial incentives with MVI. (SA-173) Also, the record

18

shows that the government did not inform Teman's defense that it had interviewed MVI's counsel (Mr. Schonfeld), prior to the underlying trial. (SA-173-210)

During trial, evidence was admitted that Teman attributed alleged complaints by customers due to internet connectivity problems. (A-472, 573-74, 638-40) The foregoing new evidence shows that Soleimani provided there were internet problems, which were caused by the landline internet and not the GateGuard device(s), which had also impacted MVI, LLC's internet service. (SA-120-43) This evidence was clearly not merely cumulative as there was nothing similar that had been offered by either the prosecution or the defense during trial.

Also, p. 27 of the answer brief says that Soleimani testified he never signed any kind of terms. However, the record shows that the payment terms are online terms and are not signed. The GateGuard website homepage contained a form through which the customer provided its contact information and information regarding its properties and also, as is customary for on-line businesses, contained a link to GateGuard's Terms and Conditions the customer must check to signify its agreement with the terms and place an order for the desired products and services. (A-872:21-25, A-873:1-9) Further, Teman included a link to this web landing page, at Gateguard.xyz, on official correspondence with clients. A-1856. The Terms and Conditions expressly provided that the customer agreed to updates to the terms and other documents incorporated by reference without any requirement

19

for express agreement to these updates. A-1809. The Terms and Conditions also contained a link to payment terms authorizing the use of "remotely created checks" – or RCC's – in the event of customer defaults or to secure payment of a device removal fee. A-1884 (Permission to Make Bank Draws and Other Account Draws).

Page 27 of the answer brief states the trial evidence established that Teman's customers, including Soleimani and the ABJ Companies, had not been aware of the fees for device removal, attorney use, or chargebacks which they purportedly owed. Soleimani testified that he "did not recall" whether he signed up for the GateGuard products and services through GateGuard's online platform. A-726:8-13. However, he acknowledged using the online platform, which as noted above, requires acceptance of the online terms to sign in. A-727:5-6. As such, the newly discovered evidence shows that Soleimani was also not paying another vendor, MVI.

Page 27 of the answer brief also provides that the internet connectivity issues were to blame for the ABJ Companies GateGuard devices not working is entirely immaterial and instead the issue at trial was whether Teman fraudulently withdrew money from his clients' accounts without authorization. However, the government utilized the internet connectivity evidence to prosecute Teman in this matter. For example, p. 4 of the answer brief indicates that the internet

20

connectivity and device issues persisted, so the customers told Teman they would stop using his intercoms or would look elsewhere when ordering devices for other buildings. (A-470-71, 644, 1763, 1815).

As noted within the initial brief, the test for Rule 33 motions often includes a requirement that the evidence be not "merely cumulative or impeaching." See Owen, 500 F.3d at 88. This does not mean that newly discovered impeachment evidence can never justify a new trial, only that impeachment evidence cannot be "merely" impeaching. See Wong, 78 F.3d at 79 (No new trial where evidence merely furnishes "an additional basis" for impeachment of already questionably credible witnesses). Impeachment evidence would be material if the witness whose testimony is attacked "supplied the only evidence linking the defendant(s) to the crime." See Petrillo, 821 F.2d at 85. Soleimani was the only witness who testified as to alleged misconduct by Teman to ABJ. Thus, "the likely impact on the witness[es]'s credibility [of the new evidence] would have undermined a critical element of the prosecution's case." See Payne, 63 F.3d at 1210.

As to newly discovered evidence of perjured testimony, the standard for granting a new trial under Rule 33 is less stringent than the general rule discussed in the initial brief. The critical factor in assessing the impact of[2] allegedly perjured

---

[2] It should be noted that the government had also not furnished accurate evidence of Soleimani's dealings with a housing tenant (Stanley Howell) that pertained to a credibility issue. (A-2032)

testimony is whether the government knew or should have known of the perjury. As this Court has stated:

> Courts in the Second Circuit apply two different standards when determining whether to grant a new trial based on newly discovered evidence that a Government witness likely perjured himself: If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

See Walker, 289 F. Supp. 3d at 566.

In this situation, there is a reasonable likelihood the jury would have reached a different judgment as to Counts I and III. Also, the newly discovered evidence of Brady-Giglio violations provide an independent basis for a new trial. "When the defendant, as in this case, asserts the newly discovered Brady evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was 'material.' See Schledwitz, 169 F.3d at 1011. The United States Supreme Court has elaborated on the meaning of "materiality" in this context:

> A defendant need not *demonstrate* that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Kyles, 514 U.S. at 434-35.

Indeed, "the Government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense." See Meregildo, 920 F. Supp. 2d at 438-39; Rodriguez, 496 F.3d at 225-26 ("This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions"). In Giglio, the Supreme Court explained that Brady "held that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." Courts have universally granted new trials where the Government violates Brady and/or Giglio. See Andrews, 532 F.3d at 905 ("If the undisclosed evidence is material, a new trial is required"; Fahie, 419 F.3d at 252 ("the Court has assumed that *Brady* violations that have affected the judgment of a jury normally will be remedied by a new trial…"); Cuffie, 80 F.3d at 517 (D.C. Cir. 1996)("Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict").

Where, as here, "the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." See Wallach, 935 F.2d at

23

456; <u>Sanders</u>, 863 F.2d at 225 (question is whether the jury's verdict 'might' be altered). If the government knowingly permitted the introduction of false testimony, reversal is "virtually automatic." <u>See</u> <u>Stofsky</u>, 527 F.2d at 243. Indeed, even if the Government did not knowingly permit the introduction of false testimony, "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted. <u>See</u> <u>Id.</u>, at 246-47.

Here, the undisclosed evidence on its face not only raises substantial questions as to the existence of Teman's *mens rea* in the context of a contract dispute, but also, it suggests the presence of additional relevant emails further discussing the basis for contractual liability under GateGuard's Terms and Conditions. This would reasonably place the matter "in such a different light as to undermine confidence in the verdict" with respect to Counts I and III.

To the extent the undisclosed evidence would undermine the credibility of Soleimani, that too would affect confidence in the verdict. "*Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial." <u>See</u> <u>Madori</u>, 419 F.3d at 170. Also, since Soleimani was a key witnesses in the Government's case in chief, the jury, if made aware of the foregoing, certainly 'might' have acquitted. <u>See</u> <u>Stofsky</u>, 527 F.2d at 246-47.

Indeed, the jury would likely have rejected the prosecution's pleas to believe its Soleimani's testimony and would have acquitted.

Further, as noted within the initial brief, there are limits to the district court's discretion not to hold an evidentiary hearing, especially when Governmental misconduct is alleged. Here, Government misconduct has been alleged and an evidentiary hearing is necessary to insure an adequate record upon which to base an enlightened ruling. See Disston, 582 F.2d at 1110-12.

**1. Teman's Rule 33 Motions Were Timely.**

Pages 28-29 of the Government's answer brief argues that Teman's Rule 33 motions were not timely and that he did not show good cause for a retroactive extension of time or why an alleged untimely filing resulted from excusable neglect. Here, the jury's verdict was returned on January 29, 2020. (SA-20) Teman's Rule 33 motions were filed on September 15, 2023 and September 21, 2023. (SA-150, SA-173)

However, as noted above, Teman's Rule 33 motion dated September 21, 2023, indicates "The defendant preserves all issues in this document, as well as DOCS 384, 386, and 295 for appeal." (SA-173-187) In note, DE295 is dated January 6, 2022, which is located in the Supplemental Appendix on appeal, at SA-120-141, asserts the argument related to Soleimani and ABJ. Therefore, Teman's

arguments related to Soleimani and ABJ were initially filed within two (2) years of the jury's verdict.

Also, as to all of the arguments made under Teman's Rule 33 motions, Teman showed good cause for any alleged late filing because in his Rule 33 motion dated September 21, 2023, Teman indicated the court stated it would not entertain motions while the case was on direct appeal (SA-176, SA-148-49). The district court's order dated February 18, 2024 (SA-148-49), states in relevant part: "Accordingly, the Court's intention is to defer addressing Mr Teman's *pro se* applications pending the disposition of his direct appeal. *See* Dkt. 265 (noting that the filing of a notice direct appeal, as a general rule, divests the district court of jurisdiction to modify its judgment or to take action affecting the case)(citations omitted)." (SA-148-49). On August 18, 2023, this Circuit Court's mandate issued. (DE380) As noted, Teman filed his Rule 33 motions soon after on September 15, 2023 and on September 21, 2023 keeping in mind that Teman had initially filed the Soleimani and ABJ arguments on January 6, 2022, which was within two (2) years of the jury's verdict. (SA-150, SA-173)

Lastly, as the Government indicated within footnote 5 of its answer brief, if the Court is inclined to conclude that Teman may be entitled to a new trial on the merits, this Court should remand for the district court to address the timeliness question in the first instant. (*See* SPA-2 (noting that the Government's

untimeliness argument was "substantial" but declining to consider it; "[i]n the event that the Court's denial of the Rule 33 motions on the merits were overturned, the Court would then take up the question of timeliness."))

## CERTIFICATE OF COMPLIANCE

I, Thomas J. Butler, an attorney duly admitted to practice before this Court, hereby certify that the foregoing memorandum of law contains <u>6,400</u> words, in compliance and that this memorandum complies with the Court's applicable formatting rules. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum.

This brief complies with the word count limitations of Fed. R. App. P. 32(a)(7)(B)(ii), excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced 14-point Times New Roman typeface font using Microsoft Word.

Dated:    March 10, 2025                               */s/*Thomas J. Butler
                New York                                 Thomas J. Butler, Esq.